# EXHIBIT 2

OLIVER HILSENRATH
822 Eastbrook Ct.
Danville, CA 94506
Telephone: 925.212.6299
Facsimile: 925.736.7571
Email: oliver_hilsenrath@sbcglobal.net

PETITIONER *In Pro Per*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **Case No. CR 03-0213 WHA** |
| **Plaintiff,** | **AMENDED MOTION FOR A WRIT OF** |
| **v.** | **INJUNCTION** |
| **OLIVER HILSENRATH,** | ——————————————— |
| **Defendant.** | **Judge: Hon. William H. Alsup** |

Pursuant to this Court's order Doc 421 of today, September 20, 2007, Petitioner Oliver Hilsenrath

hereby submits to the court this AMENDED MOTION FOR A WRIT OF INJUNCTION

including a true copy of Exhibit A: the HOLTKAMP ORDER.

# INTRODUCTION

On September 10, 2007 the Office of International Affairs/Criminal Division of the DOJ (OIA/CRIM DIV) mailed Petitioner, by registered mail, a document containing an English and French version of a Swiss order signed by a Mr. Holtkamp (HOLTKAMP ORDER) who identifies himself as a Federal Attorney operating out of Bern, Switzerland.

The HOLTKAMP ORDER is submitted to the court under seal in order to protect Petitioner, members of the US government and others from undue libel [Exhibit A].

The HOLTKAMP ORDER attempts to re-adjudicate matters adjudicated and concluded by this court in **Case *3:03-cr-00213-WHA USA v. Hilsenrath***.

Furthermore, Petitioner believes that the service of the HOLTKAMP ORDER is in violation of the United States' Constitution and in violation of international law.

The service of the HOLTKAMP ORDER by OIA/CRIM DIV on Petitioner, if carried out, would constitute an act of furtherance of an unlawful act and would trigger a series of actions in violation of the US Constitution and in violation of international law.

Subsequently, Petitioner alerted the OIA/CRIM DIV of the possible violations of law and requested a stay on the service, in order to allow the Court to review this current motion for a Writ of Injunction. [Exhibit B – Current Case, Doc 417: Judicial Notice of 9/11/2007]

Petitioner understands that the OIA/CRIM DIV decided to stay the service and extend the Court the courtesy of necessary time to review this motion.

## THE HOLTKAMP ORDER

The HOLTKAMP ORDER states the following:

1.  HOLTKAMP states that he investigated Petitioner for 3 years but was unable to bring any charges in Swiss Court;

2.  HOLTKAMP states that he blames the US government for *de facto* sabotaging his above investigation;

3.  HOLTKAMP states that he blames Petitioner for not "sufficiently impeaching himself" to facilitate charges in Switzerland;

4.  HOLTKAMP states, nevertheless, that he orders – effective 10 days from service of his order - to confiscate Petitioner's family assets in Switzerland in order to cover the cost of his botched investigation;

5.  HOLTKAMP states that he "invites" the US government to "participate" in the
    confiscation-spree by taking Petitioner's family and business partners' assets in other
    European countries – also effective 10 days from service of his order.

6.  HOLTKAMP states that he will maintain an open-ended criminal action against Petitioner
    and alerts of an (unclear) open-ended arrest warrant for Petitioner's arrest.

7.  HOLTKAMP indicates that 10 days after the service of his order, unless an appeal is
    made to the Swiss high court, the entire order shall be effective and shall be put in action.

Clearly, if completed, the OIA/CRIM DIV's service of this order will trigger a 10 days
countdown after which this order will be effective – unless it is appealed to the Swiss high court.

As this Court well knows, the Swiss have not allowed access to any of the frozen assets
for over 3 years to hire legal assistance in either the US or in Switzerland. Therefore there is no
good faith attempt to adjudicate the matter but rather to circumvent the courts altogether.

More so, the Swiss seemingly continue to adjudicate matters of US law, already
adjudicated and concluded in this court in **Case *3:03-cr-00213-WHA USA v. Hilsenrath.***
[Exhibits C and D – Orders of this Court: Doc 302 and Doc 309]

Petitioner believes that the HOLTKAMP ORDER is therefore in breach of US and
international law as well as the Treaty in multiple ways:

1.  HOLTKAMP orders unlawful confiscation without adjudication, and without even the
    existence of charges;

2.  HOLTKAMP orders re-adjudication of already adjudicated and concluded matters in the
    US District Court in violation of the Treaty's principle of comity. All legal matters in
    Holtkamp's order have occurred in the US and were concluded under US law.

3.  HOLTKAMP orders an unlawful open-ended criminal action against Petitioner to include
    a continuous threat of arrest at will, with no cause or charges - in violation of the
    unanimously adopted right of due process, speedy adjudication and conclusion of legal
    actions.

4.  HOLTKAMP threatens to disseminate to multiple foreign countries a libelous document
    targeted to defame Petitioner, his business partners, and mostly the US government itself.

## APPLICABLE LAW

Petitioner seeks to enjoin service of an order violating fundamental constitutional rights:

1. The right to property as protected by the 5th amendment
2. The right to due process as protected by the 5th and 6th amendment
3. The right to a speedy adjudication as protected by the 6th amendment

These constitutional rights are unanimously upheld by international law.

Exhibit E outlines the confirmation of the abovementioned rights in international law by:

- The *American Convention on Human Rights -- Signed at the Inter-American Specialized Conference on Human Rights* [brought entirely in Exhibit F]
        and
- The *Universal Declaration of Human Rights -- Signed at the United Nations' General Assembly* [brought entirely in Exhibit G]

## SUMMARY

Considering the above, Petitioner moves this court for a Writ of Injunction to:

1. Determine that the HOLTKAMP ORDER is in violation of US law and international law.
2. Enjoin the US Government, specifically the Criminal Division of the Office of International Affairs (OIA), from serving on Petitioner an unlawful order and by that to trigger a series of actions in violation of Petitioner's rights under the US Constitution and international law.
3. Enjoin the US Government from taking part in an unlawful confiscation of Petitioner's, Petitioner's family and Petitioner's business partner's assets.
4. Enjoin the US Government from complying, through service of process, to an unlawful *status quo* regarding the matters adjudicated and concluded in **Case *3:03-cr-00213-WHA USA v. Hilsenrath***.

Dated: September 20, 2007

Respectfully submitted,

OLIVER HILSENRATH

Petitioner *In Pro Per*

_____/s/ Oliver Hilsenrath_____

1    **/ATTACHMENTS/**

2

3    **Exhibit A** – The HOLTKAMP ORDER

4

5    **Exhibit B** – Current case Doc 417 – Hilsenrath letter to the OIA/CRIM DIV of 9/11/2007 re stay
     of service

6

7    **Exhibit C** - Current case Doc 302 – This court's first order re Swiss freeze

8

9    **Exhibit D**  - Current case Doc 309 - This court's second order re Swiss freeze

10

11   **Exhibit E** – Summary of legal arguments of international law (entire text in Exhibits F and G)

12

13   **Exhibit F** - American Convention on Human Rights -- Signed at the Inter-American Specialized
     Conference on Human Rights

14

15   **Exhibit G** - Universal Declaration of Human Rights -- Signed at the United Nations' General
     Assembly

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBITS

# Exhibit A

The HOLTKAMP ORDER

Office of International Affairs

MEW:PR:CF:DNV:mtn
182-18409

_____

*Washington, D.C.  20530*

SEP - 6 2007

**CERTIFIED MAIL RECEIPT# 7003-3110-0003-6803-9462**

Oliver Hilsenrath
822 Eastbrook Court
Danville, CA  94506

Dear Mr. Hilsenrath:

     Re:    <u>Request from Switzerland for Service of Process</u>

     The Ministére public de la Confédération MPC, in Switzerland has asked this office to serve you with the enclosed documents.  You should carefully review these documents for instructions and deadlines.  If you have any questions concerning this matter, please contact the foreign court directly or the Swiss consulate in your area.

                      Sincerely,

                      Mary Ellen Warlow
                      Director
                      Office of International Affairs
                      Criminal Division

By:                       

                      Colette Ford
                      Trial Attorney

Enclosures



Schweizerische Eidgenossenschaft
Confédération suisse
Confederazione Svizzera
Confederaziun svizra

Federal Department of Justice and Police FDJP
**Federal Office of Justice FOJ**
Mutual Assistance Unit

Swiss Confederation

SIV, FOJ, Bundesrain 20, 3003 Berne, Switzerland

**FEDERAL EXPRESS**
Office of International Affairs OIA
Department of Justice
Suite 800
1301 New York Ave., N.W.
Washington DC 20005
UNITED STATES

Your reference : (182-18409)
Our reference : B 142'876 SIV

Berne, August 27, 2007                                             <u>Urgent</u>

**Re: Our request for service of documents on HILSENRATH Oliver**

Dear Sir or Madam

According to article 22 of the Treaty between the United States of America and the Swiss Confederation on Mutual Assistance in Criminal Matters, the Federal Office of Justice/Swiss Central Authority, requests the service of the enclosed documents on the above-mentioned person.

We invite you to send us the proof of service which has to be dated and signed by the recipient. Thanks in advance for your assistance.

Yours faithfully

Verena Siegenthaler

Enclosures: decision of August 23, 2007 & English translation

*182-18409*

Verena Siegenthaler
Bundesrain 20, 3003 Berne, Switzerland
Telephone : +41 31 322 42 64, Telefax : +41 31 322 53 80
irh@bj.admin.ch
http://www.bj.admin.ch

6.8.1/B 0142876/IRH2007006671/G351-0093

Federal Attorney:        Brent Holtkamp
Deputy Federal Attorney: Giorgio Fumagalli
Clerk:                   Diane Conrad-Taggesell
Criminal Procedure n°:   MPC/EAII/7/05/0271
**Bern, 23 August 2007**

# PROVISIONAL SUSPENSION OF INVESTIGATION
## (OLIVER HILSENRATH)

## AND

# CESSATION OF CRIMINAL PROCEEDINGS
## (DAVID KLARMAN)

conducted into the per-        **Oliver HILSENRATH,** born on 27 April 1957 in Romania, Israeli
sons of:                       and American national, son of Andrei HILSENRATH and Melanie
                               KAHANE, married to Hana HILSENRATH, domiciled at
                               822 Eastbrook Court, USA – 94506 Danville, California,

and                            **David KLARMAN,** born on 30 September 1964 in Queens/NY,
                               American national, son of Abraham Milton KLARMAN and Iris
                               KATZ, economist and lawyer, married to Marie COCCHIARO,
                               domiciled at 4 Abigails Path, USA - 11937 East Hampton, New
                               York,

for:                           money laundering (Art. 305bis of the Swiss Penal Code SPC)

**IN VIEW OF:**

the case file of the investigation opened by the criminal investigation police on 24 February
2004 into the person of David KLARMAN, and subsequently extended as of 16 August 2004
into the person of Oliver HILSENRATH;

the 8 November 2005 Request to initiate a pre-trial investigation;

the file on the pre-trial investigation being conducted since 13 December 2005 and the final
report submitted by the Federal Examining Magistrate on 1 June 2007;

Ministère public de la Confédération MPC
Diane Conrad-Taggesell
Taubenstrasse 16, 3003 Bern
Tél. +41 31 322 06 80, Fax +41 31 322 05 03
www.ba.admin.ch

**WHEREAS, FACTUALLY AND LEGALLY:**

This investigation is set against the backdrop of the fraud scheme of which the company US WIRELESS CORPORATION, Delaware (hereinafter USWC), was victim between the month of October 1996 and 29 May 2001, date on which the trading of the Company's stock was discontinued on the American stock market (Nasdaq);

The investigations were particularly aimed at the supposed criminal intrigues of the former directors to the detriment of the company presently in bankruptcy, as well as at the exact circumstances and specific behavior attributed to the suspects David KLARMAN and Oliver HILSENRATH in relation to the acquisition, during the course of their criminal activity, of property and transferable assets, namely USWC-issued stocks and options sold on the American market in violation of their contractual duties and obligations under American law;

At the conclusion of the Swiss inquest, it appears evident that, in substance, the former directors of USWC misused their powers in order to illegally acquire company options and stocks by making use of several shell corporations lying within their sphere of control, that is to say ISD TELECOM INVESTMENT GROUP, BISKARA LTD, CRAIGLANDS LTD, MSD INVESTMENT ADVISORS INC., MSD NEW TECHNOLOGIES INC., SILICON VALLEY INVESTMENT PARTNERS and BORAZON LTD, i.e., representing a total of 825,002 shares;

It also emerges from the investigation that suspects David KLARMAN and Oliver HILSENRATH, either alone or jointly, committed several acts detrimental to the monetary interests of USWC by transferring – for no valid reason and with nothing in return – various assets to the companies KS LEGAL CONSULTANTS LTD and TELECOM ASSOCIATES;

The criminal activities discovered mainly during the course of the American investigations and, to a large extent, confirmed by the complementary investigative measures conducted in Switzerland, are those set down in detailed form namely in the following documents:

- *plea agreement* and *superseding information* of David S. KLARMAN from the month of December 2003 (cf. Annexes file, heading 18, CRI USA, exhibits BA 5 004 to 5 019),
- *fourth superseding indictment* of Oliver HILSENRATH from the month of May 2005 (cf. Annexes file, heading 18, CRI USA, exhibits BA 6 262ff),
- *plea agreement of Oliver Hilsenrath* from the months of January/February 2007 (exhibits 2200000085 to 2200000090),
- statements of David S. KLARMAN made on 31 August 2004, and confirmed in particular by the document included as exhibit 1602000177,
- statements of Messrs. Norman L. PADGETT and John S. YUN (exhibits 1800020629ff and 1800020767ff)
- civil suit n° C-03-33252 filed in July 2003 and in June 2005 by the Securities & Exchange Commission (hereinafter SEC) (exhibits BA 21 073 to BA 21 085 ; exhibits 1800020204 to 1800020233 ; exhibits 1800020581ff),
- final report of the Office of the Federal Examining Magistrate (exhibits 2200000195ff)
- reports, summaries, and synoptic tables of the financial analyses carried out for the most part during the month of August 2006 (cf. 10.1, specifically exhibits 1 0001 to 1 0008, 2 0001 to 2 0005, 3 0001 to 3 0003, and 4 0001 to 4 0008);

These intrigues caused economic losses for the company; however, no rigorously precise calculation has been able to be made as is habitually done in criminal cases due to the behavior of the American authorities which will be exposed here-below;

Nevertheless, it cannot be judged arbitrary to consider the amounts concerned as being substantial if we take into account the initial estimations voiced by the American authorities and the present status of the outstanding debts following the bankruptcy procedure which exceed the sum of USD 19 million;

These very actions are at the origin of the offenses charged in the indictment of the American authorities, with respect both to David KLARMAN and to Oliver HILSENRATH, insofar as they constitute activities coming under the scope of American criminal law, more precisely, the *Securities Act of 1933* and the *Securities Exchange Act of 1934*;

These same actions have already been confirmed, as mentioned above, to a very large degree by the present investigations and analyses carried out namely at the Office of the Examining Magistrate (exhibits 2200000195ff – final report, as well as the 4 binders under heading 10.1);

In any case, the investigative measures and controls undertaken to exculpate the suspects, should the need arise, resulted in a dead-end since, instead of ruling out the facts suspected as being at the origin of the present case, these very same elements of crime were to a large part confirmed, thus tending moreover to reinforce credence of the other criminal acts suspected;

It is also necessary to mention that Swiss authority to investigate and prosecute criminal behaviour suspected of falling under Swiss money laundering provisions is not reliant of a an ongoing criminal procedure pending abroad, nor of conviction rendered in a foreign Country, it isn't even mandatory that the wrongdoer be identified,

It is sufficient that the facts forming the predicate crime be unlawful according to foreign legislation, that prosecution is not hindered by the Statute of limitations and that same facts, if committed in Switzerland, would be constitutive of a criminal offence according to Swiss law (cf. ATF 120 IV 323 et 126 IV 255),

Nonetheless, the Swiss criminal authorities lack an exhaustive picture of all the facts since the American authorities have, in violation of their international duties, knowingly refused to provide the information formally requested via mutual legal assistance in criminal matters;

By way of justification, the American criminal authorities invoked legal precedent resulting from domestic American legal practice, and did so by unilaterally and in an amazing manner anticipating the objectives being pursued by the Swiss authorities and the probable outcome of the actions formally requested, primarily the production of existing documents and the holding of complementary hearings;

This type of behavior runs strongly counter to the rules and principles characterizing international cooperation, namely those compelling the state organs to do their utmost in respecting their international commitments so as to ensure the effectiveness of criminal prosecution and international cooperation in criminal matters;

In any case, Assistant U.S. Attorney Laurel BEELER, in her letter of 18 July 2006 (exhibit 1800020448ff), while reiterating the accusations previously cited, including those with regard

to David KLARMAN, affirms that the funds obtained by means of criminal behavior as ascer-
tained by the American legal actions listed above, were not transferred to establishments
located on Swiss territory;

In this connection, she nonetheless reserves for Oliver HILSENRATH those movements of
funds related to the transfers conducted for the benefit of TELECOM ASSOCIATES along
with those resulting from the sale of 350,000 USWC shares;

In relation to this last point and in the same above-mentioned letter, she notes that the
American authorities had misunderstood the facts and circumstances surrounding the sale of
the 350,000 shares, legally acquired within the framework of a *reverse merger* with American
Toys Inc. and at the same time property of Oliver HILSENRATH, and consequently had been
mistaken as to the legal qualification to be imputed to these factual elements;

Earlier, an infraction against American legislation had been retained for violation of the obli-
gation imposed by American law to announce beforehand by means of a 10-KSB form, a
formality that had to take place prior to the sale of shares quoted on the stock market;

She now points out that the above-mentioned forms had been duly filled out and submitted in
good time;

This affirmation is in contradiction with the declarations and testimony of David KLARMAN
(exhibit 1602000177ff) in statements that have moreover been confirmed and even backed
up on several occasions by the suspect;

The facts as they have been made known by David KLARMAN are perfectly logical and in
harmony with the facts that have been established with certitude during the pre-trial investi-
gation;

His account is coherent from a chronological point of view;

The legal analyses formulated by David KLARMAN are also supported by several points in
the legal opinion issued by the Swiss Institute of Comparative Law (exhibit 0900020286ff);

Moreover, the accused has always proved to be cooperative and his statements have not
fluctuated over the course of time as a function of his defense in contrast to the accused
Oliver HILSENRATH;

The statements of David KLARMAN in reference to the funds supposedly extorted by David
DAHAN have been corroborated by the financial movements verified in the investigative pro-
ceedings, in particular in relation to the company DYKE LTD;

For all these reasons, the statements of David KLARMAN enjoy high credibility in the eyes of
the Federal public prosecution authority;

Moreover, Assistant U.S. Attorney Laurel BEELER, in reference once again to her letter of 18
July 2006 (exhibit 1800020448ff) is incorrect in her affirmation that the funds resulting from
the sale of the shares ceded – unbeknown to the authorities and to the general public thanks
to the intermediary of shell corporations – were not transferred to Swiss territory apart from
the income stemming from the 350,000 shares sold beginning with 24 November 1999;

The investigation has indeed identified transfers totaling USD 469,723.22 carried out with the bank Crédit Suisse to the benefit of Oliver HILSENRATH between 24 September 1997 and 3 June 1999, and which originate from the sale of securities effectuated via the companies TELECOM ASSOCIATES LTD and BORAZON LTD;

All of these funds were transferred to Switzerland from the MATHESON BANK (JERSEY) LTD;

These securities are not to be confused with those acquired at a later date, i.e., after 13 March 1998 (exhibits 2200000195ff – final report);

Moreover, Laurel BEELER remains silent on another important point, to wit, the sale of shares barred by legal impediment, more exactly the restriction to divest as imposed by the regulation No. 144 of the SEC (*sales of restricted and/or control securities)*;

In connection with this last point, the Federal public prosecution authority has come to the conviction that USWC, contrary both to what is true and to the legislation in force at the time, duplicitously authorized the lifting of the legal restriction on the shares in question by means of a letter from David KLARMAN dated 28 June 1999;

It follows from this that the operations on mobile assets, commonly known as *stock cross* or *sham sale,* which took place as a result, came about in a manner violating the law;

As a matter of fact, and contrary to the elements of information announced in the S-3/A Form issued on 18 September 1997, here it is a question of completely different shares, corresponding to stockholder certificate no. 106 and acquired on 13 March 1998, that were sold on the American market between 30 November 1999 and 9 February 2000 for the sum of USD 6,677,787.20, of which USD 6,497,920 transited through the account held by Oliver HILSENRATH at the Crédit Suisse bank in Zurich;

It should be specified that on 8 September 1998, stockholder certificate no. 106 was split on the order of Oliver HILSENRATH into two sub-certificates nos. 196 and 197, representing 350,000 and 46,576 shares of USWC, respectively (exhibits 2200000195ff – final report);

Furthermore, the company USWC expressly stated in a letter dated 3 August 1999 that the shares initially registered for sale in the S-3/A Form filled out in September 1997, could no longer be sold beyond the month of August 1999 (exhibit 0900011235ff);

For all of these reasons, it follows that the 350,000 shares previously mentioned were sold at an unauthorized period in time since this came about after the period covered in the registration statement had expired, and that the multiple transfers of securities that took place notwithstanding, should have been made known to the public by means of the Forms referred to as 4 or 5 of the SEC (exhibit 1602000179);

All of the foregoing is perfectly coherent and in keeping with the logic of crime inspiring the accused since the staggered sales of these securities pose a problem for another reason to the degree that they take place during a period in which Oliver HILSENRATH, in his position as General Director of USWC, undertook to make a series of announcements to the general public concerning events supposedly of the kind that would have an effect on the development of the Company, but which in the end never came to pass (exhibit 1700000001ff);

By acting in this manner and misusing his position, Oliver HILSENRATH was, in all probability, seeking to influence the market price of the stock or, at the very least, to buttress the trading value in spite of the 350,000 shares which had been put up for sale on the American market during the short sale period mentioned above;

The investigation also confirms that funds totaling USD 348,000 were misappropriated from the company USWC by way of 29 monthly payments of USD 12,000 transferred between 25 August 1997 and 4 January 2000 to the company TELECOM ASSOCIATES LTD in Jersey;

At the same period, transfers totaling USD 80,000 were also diverted from USWC to the benefit of KS LEGAL CONSULTANTS LTD;

These transfers were made upon the order of Oliver HILSENRATH, at times with the backing of David KLARMAN, and logged into the accounting ledger without any appropriate voucher and under false pretexts, i.e., various fictitious consulting contracts. This was done in violation of the legal and contractual duties incumbent on him in a top-management position at USWC, namely with respect to the official and obligatory announcements made at the same period to the *Securities and Exchange Commission*;

By placing their personal interests above those of the Company, and doing so with the goal of personal enrichment, the behavior of the suspects indeed seems to bring together all of the conditions both objective and subjective for the crime, according to Swiss law, of qualified breach of trust in execution of administrative duties – or even that of fraud – along with forgery of documents;

In view of the foregoing, it appears all the more incomprehensible that several points of the accusations compiled by the Americans have been abandoned exclusively with respect to the suspect Oliver HILSENRATH, as was done within the scope of the plea bargain concluded in the month of February 2007;

Choosing to do so may be the reflection of a certain impatience, or even a dilemma, on the part of the American criminal authorities;

As things stand and despite the significant efforts made by the magistrates of the Office of the Attorney General of Switzerland and the Office of the Federal Examining Magistrate, the offenses which Oliver HILSENRATH is strongly suspected of having committed, have not been able to be established in a manner fulfilling the legal requirements;

As mentioned above, this is to be imputed to the less-than-cooperative and questionable attitude of the American authorities, who gave the impression of being driven exclusively by their own national interests without any concern for those of the Swiss authorities to facilitate a legal outcome in conformity with what is fair and just;

The absence of the final elements of proof indispensably required to consolidate the Swiss criminal investigation and to allow for the suspect Oliver HILSENRATH to be once and for all unmasked in his contradictory, or even concocted, statements, calls for the case to be provisionally suspended;

It is inconceivable to refer the case of Oliver HILSENRATH – partially by default, if this should be the case – to the Federal Criminal Court without first being able to make use of the results of the modest measures of investigation requested in the requests for legal assistance issued over the last months and which have unfortunately gone unheeded;

The suspect has, moreover, never been confronted with the latest elements of the pre-trial investigation and has upon a number of occasions refused to reply to the specific questions that were put to him;

The few explanations that he has provided seem to have been created out of thin air following the initiation of criminal proceedings against him, and they enjoy very little support in the scant amount of documentary evidence that he has produced to this day;

Both *de facto* and contrary to his allegations, he has always refused to produce the documents of key relevance that would have made it possible to elucidate the facts of the case;

Of course, he is not obliged to be cooperative thanks to the rights guaranteed him by the Swiss criminal procedure;

Nonetheless, because of his behavior and direct omissions, he has considerably complicated and slowed down the investigations, forcing the Federal magistrates to multiply their investigative measures and to issue numerous requests for legal assistance, principally issued by the Federal examining magistrate, and then to request a legal opinion as well as an in-depth analysis of the transactions and stock market operations carried out;

This being the case, he is obliged to assume the financial consequences resulting from his procedural machinations;

In a just measure, the expenses have been slightly reduced so as not to have him shoulder the financial consequences resulting from the omissions attributable to the American authorities;

In view of the overall circumstances of the investigation and in light of the facts established, the expenses should thus for the major part be charged to Oliver HILSENRATH, i.e., four-fifths (4/5), with the remaining one-fifth (1/5) going to the charge of the suspect David KLARMAN;

As concerns the activities conducted by David KLARMAN on Swiss soil, they have largely been confessed to and have been confirmed by the investigative measures undertaken;

The principal acts describing the predicate crimes admitted by the suspect, crimes which, moreover, are at the origin of the funds understood as being the proceeds of crime, have been mentioned above;

For sake of simplicity and so as not to uselessly repeat the facts admitted, this Ruling makes express reference to the same and is based on these elements;

As concerns the amounts intentionally laundered by the accused, let it be specified that David KLARMAN had a total amount of USD 4,786,595.80 transferred, within the period of March 2001 and October 2002, via the bank accounts belonging to him at the UBS and the CS banks;

In so doing, it was his desire to hinder the identification of the origin, the discovery, and the confiscation of the funds of criminal origin stemming from the crimes to which he admits having committed in concert with Oliver HILSENRATH to the detriment of the company USWC;

He notably confirmed these points during the hearing in San Francisco on 17 May 2005,
conducted in the execution of a request for legal assistance;

Case 3:03-cr-00213-WHA    Document 42-3    Filed 09/20/2007    Page 18 of 80

For the reasons already specified, the explanations concocted by Oliver HILSENRATH with respect to the American factual events, are not at all credible and it is maintained that the above-mentioned transfers are closely related to the predicate crimes committed on American soil and not only those to which he finally confessed within the scope of the plea bargain concluded in the month of February 2007 and formally submitted to the American court;

In this way, the undersigned Federal Attorney has acquired the conviction that Oliver HILSENRATH is guilty of the crime of money laundering on Swiss soil in accordance with Article 305bis of the SPC in view of the numerous pieces of evidence contained in the case file of the Swiss criminal procedure;

In point of fact, by acting in the manner described above, Oliver HILSENRATH manifestly wanted to lauder, that is to say, to obstruct the identification of the origin, the discovery, and the confiscation of funds of criminal origin stemming from the wrongdoings which he committed alone or in concert with David KLARMAN to the detriment of the company USWC (cf. above);

This conviction is namely based on the concrete actions undertaken by the suspect shortly after the receipt of these funds in Switzerland, actions aimed at transferring these assets very rapidly on to other locations while transforming them into other forms of assets (diamonds and real estate);

The foregoing, however, does not allow us to deviate from one of the cardinal principles of the criminal procedure, namely that the Federal public prosecution authority always bears the burden of proof and is thus obliged to renounce the indictment and referral of a person accused to trial at criminal court if all of the elements indispensable for allowing a relatively certain criminal conviction to be pronounced are not present in the case file;

This is the situation with which we are confronted today with regard to the accused Oliver HILSENRATH;

The Undersigned has therefore no other choice but to suspend his investigational research, research which will be able to be resumed if the continuation of the legal proceedings should evolve in a favorable manner;

This state of affairs, however, should not make it possible for the accused to escape with impunity either from all of the direct consequences linked to both his established criminal activities and to those still suspected, or from those engagements which he made within the scope of the *plea agreement* concluded in February 2007;

According to the terms of this present legal act, tantamount at present to a judgment, the accused Oliver HILSENRATH is obliged to transfer the assets in his possession, amounting to at least USD 2 million, to the American authorities;

It is to be pointed out that this amount is largely covered by the assets that he ordered to be transferred outside of Switzerland, with only a tiny part of the assets still to be found on Swiss soil and being obliged, incidentally, to be affected to cover payment of the investigation fees caused by the accused Oliver HILSENRATH;

The assets still under precautionary court attachment ordered abroad by means of mutual legal assistance in criminal matters, are precisely those transferred to the destinations of Poland and Belgium;

As a *pro memoria,* the requests for legal assistance addressed to these two States were motivated by the criminal behaviors mentioned above, as well as by the discovery, during the investigation, of several transfers destined for deals in diamonds, i.e.:

- USD 2,380,300 transferred in July 2001 to PAN BRAZZAVILLE DIAMONDS SA,
- USD 1,540,700 transferred in several transactions between December 2001 and January 2002 to CANADA 20 and SOFAM FINANCIAL SERVICES LTD,
- and USD 610,000 transferred in February 2004 to Robert FAWCETT,

As well as the transfers for real estate operations conducted in Poland, i.e.:

- USD 985,000 transferred in several transactions conducted in the month of February 2004 to the benefit of KOSMO SPOLKA Z.O.O.W. ORGANIZACJI, Krakow;

Concerning the latter company and its role in this case, please refer to the documents of the mutual legal assistance procedure included in the criminal case file;

Moreover, the Belgian authorities confirmed that they have undertaken to freeze significant assets belonging to Oliver HILSENRATH;

The same holds true for the Polish authorities who pointed out that they have undertaken various freezing measures affecting assets held directly as well as indirectly by Oliver HILSENRATH;

In view of the case file at the present stage of the pre-trial investigation, in particular the facts that serve to confirm the criminal origin of the funds that transited through Switzerland - despite the denials of the accused Oliver HILSENRATH and the lack of satisfactory cooperation by the American authorities – the precautionary court attachment measures ordered abroad can only be lifted into the hands of the American authorities;

The revocation of the requests for mutual assistance in criminal matters without any other formalities would be contrary to Swiss legal procedure;

The present decision is the only one making it possible to reconcile the interests of the American and the Swiss criminal authorities, and it moreover enables Oliver HILSENRATH to satisfy the conditions stipulated and the commitments made by him when concluding the plea bargain, today equivalent to judgment;

The Belgian and Polish authorities shall be duly informed of this as soon as this present Decision has become definitive and binding;

To summarize, with respect to the suspect Oliver HILSENRATH, the criminal investigation into his person must be provisionally suspended, any continuation in the pursuit of the pre-trial-investigation appearing impossible as things stand; the funds currently under precautionary court attachment orders abroad being under the obligation of being liberated exclusively into the hands of the American criminal authorities, and those funds located on Swiss soil, having to be assigned to covering the fees of the investigation procedure; any amount

The fate which the criminal procedure is to reserve, to the degree that it concerns the accused David KLARMAN, is however different given that his particular situation is perfectly distinct from that of the accused Oliver HILSENRATH;

As emerges from the documents of the legal proceedings and the indications given above, David KLARMAN has always proved to be cooperative with the American and with the Swiss authorities even if he wasn't obliged to do so;

His attitude reveals, on the one hand, an awareness of the seriousness of the crimes committed and, on the other hand, his sincere desire to reestablish the truth and to make amends, to the utmost degree possible, for the damage caused;

The stand he has taken in the American criminal procedure gives rise to no disagreements whatsoever, and he has already taken the steps required to repair the financial losses;

He has in effect admitted the facts and entered into a *plea agreement* with the approval of the competent court;

Thus he has been judged once and for all in the spirit of Swiss law even if, in conformity with American practice, his final sentence has not yet been pronounced;

The accused David KLARMAN is nonetheless aware of the fact that the sentence that will finally be pronounced will respect the framework of repressive measures already agreed upon and will correspond to *Total offense level n° 27* (cf. annexes under heading 18, CRI USA, exhibit 5 009), i.e., at least 70 months of imprisonment;

It is also pointed out that the accused David KLARMAN was condemned not only for mail fraud, 18 U.S.C. § 1341, but also for money laundering, 18 U.S.C. § 1956, (cf. annexes under heading 18, CRI USA, exhibits 5 004 to 5 019);

These offenses are punishable by prison sentences whose maximum durations are 5 years and 20 years, respectively, to which, in addition, monetary fines are also imposed in proportion to the amounts illegally diverted;

Repressive measures of this level are, in Swiss law, at least equivalent to a sentence amounting to 5 years imprisonment;

As a result, it turns out that this accused has in fact already been convicted for the totality of his criminal activity even if said conviction cannot formally encompass the acts of money laundering committed on Swiss territory, for which the domain of punishment is uniquely within the competence of the Swiss criminal authorities;

In any case, no punishment complementary to the American sentence can be envisioned since the range of punishment inflicted in Switzerland is objectively and comparatively less severe than that which is applied in the sentences pronounced in the United States;

In view of the foregoing, the undersigned Federal Attorney deems that only a complementary punishment and one entirely absorbed by the American conviction can be envisioned today to sanction the criminal behavior that David KLARMAN committed on Swiss territory;

The principles of rapidity and economization of legal proceedings therefore call for the cessation of criminal action directed at the person of the accused David KLARMAN, the sentence pronounced by the American authorities being sufficient as repression of the offence of money laundering detailed above;

This accused person must bear those fees incurred by the criminal proceedings which concern him; they will be deducted from the funds that are still frozen by precautionary court attachment, while any funds of criminal origin eventually remaining shall be confiscated in application of Article 70 of the SPC;

The present Decision shall be translated into English prior to notification, via diplomatic pouch, to the accused Oliver HILSENRATH, with the precision that only the French version of the text is to be considered authoritative;

For Oliver HILSENRATH, for the above motives and in view of stipulations 3, 8, 70, 305bis, 337 and 344a of the SPC, as well as 73,120, 123, 124 and 246bis of the Swiss Law on Penal Procedure LPP;

For David KLARMAN, for the above motives and in view of stipulations 3, 8, 49, 53, 70, 305bis, 337 and 344a of the SPC, as well as 73,120, 124 and 246bis of the LPP;

**the undersigned Federal Attorney rules:**

1.  The pre-trial criminal investigation into the person of Oliver HILSENRATH is provisionally suspended and will namely be resumed in the event of new facts or if the suspect places himself at the disposal of the Swiss criminal authorities.

2.  The cessation of criminal proceedings into the person of David KLARMAN taking into account the foreseeable level of severity of the American criminal conviction.

3.  The costs, in the amount of CHF 104'508.40 are principally charged to the accused Oliver HILSENRATH.

4.  The costs, in the amount of CHF 62'518.25 are partially charged to the accused David KLARMAN.

5.  The expenses to be borne by the accused persons shall be billed separately and shall be collected primarily from the assets on Swiss soil which are under precautionary court attachment order, with any eventual remainder being confiscated in application of Article 70 of the SPC.

6.  The other charges, not attributable to the accused, shall be provisionally borne by the Swiss Treasury.

7.  The assets located in Belgium as well as those in Poland and placed under precautionary court attachment order via mutual legal assistance in criminal matters shall be liberated solely in view of their transfer and subsequent placement in an escrow account in the name of Oliver HILSENRATH with the *US District Court, Northern District of California, San Francisco, California / United States of America.*

- to Me Luke GILLON, attorney, for the accused David KLARMAN, Etude Simon Pertaz Esseiva Overney, Bd de Pérolles 21, CH - 1700 FRIBOURG.

through formal channels, Federal Office of Justice (accompanied by a translation in English):
- to Oliver HILSENRATH, 822 Eastbrook Court, USA - Danville, California.



Office of the Attorney General of Switzerland AGS

Brent Holtkamp
Federal Attorney

## Legal Recourse

Whenever investigative research is suspended, the Attorney Genera is competent to undertake to have objects and assets confiscated. He communicates his decision to the person affected in written form accompanied by a short summary of the motives behind his decision. The decision on confiscation can be the object of an appeal filed at the appeals tribunal within ten days.

The victim and the aggrieved party can file a complaint against the suspension of the pre-trial investigation within ten days at the appeals tribunal of Federal Criminal Count in 6501 Bellinzona (Art. 106, para. 1$^{bis}$ of the LPP).

In accordance with Art. 105$^{bis}$, para. 2 in relation with Art. 214 ff of the LPP, the present Order can be object of a complaint sent in written form within five days following its receipt at the appeals tribunal of Federal Criminal Court in Bellinzona provided that the subject concerns the costs assigned. The appeal does not suspend the execution of the decision attacked unless the appeals tribunal or its president so order (Art. 218 LPP).

Procureur fédéral:          Brent Holtkamp
Procureur fédéral suppléant:  Giorgio Fumagalli
Greffière:                  Diane Conrad-Taggesell
Procédure n°:               MPC/EAII/7/05/0271
**Berne, le 23 août 2007**

# SUSPENSION PROVISOIRE DE L'ENQUÊTE
## (OLIVER HILSENRATH)

**ET**

# CESSATION DES POURSUITES PÉNALES
## (DAVID KLARMAN)

menée à l'encontre de:   **Oliver HILSENRATH,** né le 27/04/1957 en Roumanie, de nationalité israélienne et américaine, fils de Andrei HILSENRATH et de Melanie KAHANE, marié à Hana HILSENRATH, domicilié à 822 Eastbrook Court, USA - Danville, California,

et                       **David KLARMAN,** né le 30/09/1964 au Queens/NY, de nationalité américaine, fils d'Abraham Milton KLARMAN et d'Iris KATZ, économiste et juriste, marié à Marie COCCHIARO, domicilié 4 Abigails Path, USA - 11937 East Hampton, New York,

pour:                    pour blanchiment d'argent (art. 305bis CPS)

**VU :**

le dossier de l'enquête de police judiciaire ouverte le 24 février 2004 contre David KLARMAN, puis étendue dès le 16 août 2004 à l'encontre d'Oliver HILSENRATH,

la requête d'ouverture de l'instruction préparatoire du 8 novembre 2005,

le dossier de l'instruction préparatoire menée depuis le 13 décembre 2005 et le rapport de clôture du Juge d'instruction fédéral déposé le 1er juin 2007,

Ministère public de la Confédération MPC
Diane Conrad-Taggesell
Taubenstrasse 16, 3003 Bern
Tél. +41 31 322 06 80, Fax +41 31 322 05 03
www.ba.admin.ch

Que la présente investigation a pour toile de fond l'action dont la société US WIRE-LESS CORPORATION, Delaware (ci-après USWC), a été victime entre le mois d'octobre 1996 et le 29 mai 2001, date de la suspension de la cotation boursière des actions sur le marché américain (Nasdaq),

Que les investigations ont en particulier porté sur les agissements supposés criminels des anciens dirigeants au détriment de la société actuellement en faillite ainsi que les circonstances précises et les comportements spécifiques imputables aux prévenus David KLARMAN et Oliver HILSENRATH en rapport avec l'obtention, au cours de la période délictueuse, de valeurs patrimoniales et mobilières, notamment des actions et des options émises par USWC réalisées sur le marché américain en violation des obligations contractuelles et légales américaines,

Qu'à l'issue de l'enquête helvétique, il appert, en substance, que les anciens dirigeants d'USWC ont usurpé leurs pouvoirs pour acquérir illicitement des options et des actions de la société par le biais de plusieurs sociétés de domicile dans leur sphère de puissance, à savoir les sociétés ISD TELECOM INVESTMENT GROUP, BISKARA LTD, CRAIGLANDS LTD, MSD INVESTMENT ADVISORS INC., MSD NEW TECHNOLOGIES INC., SILICON VALLEY INVESTMENT PARTNERS et BORAZON LTD, soit au total 825'002 actions,

Qu'il ressort également de l'instruction que les prévenus David KLARMAN et Oliver HIL-SENRATH, soit isolément soit conjointement, ont commis plusieurs actes portant atteinte aux intérêts pécuniaires d'USWC, en transférant sans raison ni contrepartie diverses valeurs patrimoniales notamment aux sociétés KS LEGAL CONSULTANTS LTD et TELECOM AS-SOCIATES,

Que les agissements criminels établis principalement par les investigations américaines et largement confirmés par les mesures d'investigations complémentaires helvétiques, sont ceux indiqués de façon détaillée notamment dans les actes suivants :

- *plea agreement* et *superseding information* de David S. KLARMAN du mois de décembre 2003 (cf. classeur annexes rubrique 18, CRI USA, pièces BA 5 004 à 5 019),
- *fourth superseding indictment* de Oliver HILSENRATH du mois de mai 2005 (cf. classeur annexes rubrique 18, CRI USA, pièces BA 6 262ss),
- *plea agreement of Oliver Hilsenrath* du mois de janvier/février 2007 (pièces 2200000085 à 2200000090),
- déclarations de David S. KLARMAN du 31 août 2004, confirmés notamment par acte versé sous pièce 1602000177,
- déclarations de Messieurs Norman L. PADGETT et John S. YUN (pièces 1800020629ss et 1800020767ss)
- action civile n° C-03-33252 intentée en juillet 2003 et juin 2005 par la Securities & Exchange Commission (ci-après SEC) (pièces BA 21 073 à BA 21 085 ; pièces 1800020204 à 1800020233 ; pièces 1800020581ss),
- rapport de clôture de l'OJIF (pièces 2200000195ss)
- rapports, résumés et tableaux récapitulatifs des analyses financières effectuées essentiellement au mois d'août 2006 (cf. 10.1, spécifiquement les pièces 1 0001 à 1 0008, 2 0001 à 2 0005, 3 0001 à 3 0003, 4 0001 à 4 0008),

Que ces agissements ont entraîné des pertes économiques pour la société, lesquelles n'ont pu être chiffrées avec la rigueur pénale habituelle en raison du comportement des autorités américaines qui sera développé ci-après,

Qu'il n'est toutefois pas arbitraire de considérer que les sommes en causes sont substantielles si l'on tient compte des premières estimations articulées par les autorités américaines et l'état actuel des créances impayées de la procédure de faillite qui sont supérieures à USD 19 millions,

Que ces faits sont ceux à l'origine des infractions à charge retenues par les autorités américaines, tant à l'encontre de David KLARMAN qu'à l'égard d'Oliver HILSENRATH, car constituant des agissements tombant sous le coup de la loi pénale américaine, plus précisément le *Securities Act of 1933* et le *Securities Exchange Act of 1934*,

Que ces mêmes faits ont été confirmés, comme déjà mentionné, dans une très large mesure par les présentes investigations et analyses effectuées notamment auprès de l'Office des juges d'instruction (pièces 2200000195ss - rapport de clôture, ainsi que 4 classeurs sous rubrique 10.1),

Qu'en tout état, les mesures d'investigation et contrôles effectués pour, le cas échéant, disculper les prévenus n'ont pas abouti car au lieu d'écarter l'état de fait soupçonné à l'origine de la présente affaire, ce même état de fait a été largement confirmé, ce qui tend à renforcer par ailleurs les autres actes criminels suspectés,

Qu'il convient de préciser que la compétence des autorités helvétiques pour investiguer et poursuivre des actes soupçonnés constituer l'infraction de blanchiment d'argent ne dépend aucunement de l'existence de poursuite pénales menées à l'étranger ni du prononcé d'un jugement, ni même que l'auteur du crime préalable soit identifié,

Qu'il suffit que les faits à l'origine de crime préalable soit, selon le droit de l'Etat étranger, réprimés et non prescrits, et qu'ils soient qualifiés de crimes selon le droit helvétique (cf. ATF 120 IV 323 et 126 IV 255),

Que, néanmoins, les autorités pénales helvétiques ne possèdent pas une vision exhaustive de tous les faits car les autorités américaines - en violation de leurs devoirs internationaux - ont sciemment refusé de fournir des informations requises formellement au titre d'entraide pénale.

Qu'en guise de justification, l'autorité pénale américaine a invoqué la jurisprudence résultant de la pratique interne américaine, et ce en anticipant unilatéralement et de façon surprenante les buts poursuivis par les autorités suisses et les résultats probables des actes sollicités - principalement la production de pièces existantes et des auditions complémentaires,

Que de tels agissements heurtent singulièrement les règles et principes relevant de la coopération internationale, notamment ceux imposant aux organes d'un Etat de tout mettre en œuvre afin de respecter leurs engagements internationaux, et ce pour garantir une poursuite et une coopération pénale internationale efficaces,

Qu'en tout état, la procureure américaine assistante Laurel BEELER, dans sa détermination du 18 juillet 2006 (pièce 1800020448ss), tout en réitérant les accusations précédemment invoquées, y compris à l'encontre de David KLARMAN, affirme que les fonds obtenus au

moyen des comportements criminels établis par les poursuites américaines et précédemment énumérés n'ont pas été transférés auprès d'établissements sur territoire helvétique,

Qu'à cet égard, elle réserve néanmoins pour Oliver HILSENRATH les mouvements de fonds en relation avec les transferts effectués en faveur de TELECOM ASSOCIATES et ceux résultant de la réalisation de 350'000 actions d'USWC,

Qu'en relation avec ce dernier sujet et toujours dans le même écrit, elle indique que les autorités américaines s'étaient méprises sur les faits et circonstances entourant la réalisation de 350'000 actions, acquises licitement dans le cadre du *reverse merger* avec American Toys Inc. et propriété d'Oliver HILSENRATH et, par voie de conséquence, sur la qualification juridique à rattacher à ces éléments,

Qu'autrefois, une infraction à la législation américaine a été retenue pour violation de l'annonce préalable au moyen du formulaire 10-KSB imposée par la loi américaine et devant intervenir avant la réalisation d'actions cotées en bourse,

Qu'elle indique aujourd'hui que les formulaires précités avaient été dûment complétés, ceci en temps opportun,

Que cette affirmation est contredite par les déclarations et aveux de David KLARMAN (pièce 1602000177ss), propos par ailleurs confirmés et même étayés à plusieurs reprises par ce même prévenu,

Que les faits tels qu'exposés par David KLARMAN sont parfaitement logiques et s'accordent avec les faits établis avec certitude par les mesures d'instruction,

Que son récit est de même cohérent d'un point de vue chronologique,

Que les analyses juridiques formulées par David KLARMAN trouvent également plusieurs appuis dans l'avis de droit émis par l'Institut Suisse de Droit Comparé (pièce 0900020286ss),

Que cet inculpé s'est d'ailleurs toujours montré coopératif et ses propos n'ont pas fluctué au cours du temps au gré de sa défense, contrairement à l'inculpé Oliver HILSENRATH,

Que même les affirmations de David KLARMAN relatives aux fonds prétendument extorqués par David DAHAN sont corroborées par les mouvements financiers constatés en procédure, en particulier en relation avec la société DYKE LTD,

Que, pour tous ces motifs, les affirmations de David KLARMAN jouissent, aux yeux du Parquet fédéral, d'une crédibilité accrue,

Que, pour le surplus, la procureure américaine assistante Laurel BEELER, toujours dans sa détermination du 18 juillet 2006 (pièce 1800020448ss) se trompe en affirmant que les fonds résultant de la vente d'actions aliénées - à l'insu des autorités et du grand public grâce à l'intermédiation de sociétés de domicile - n'ont pas été transférés sur sol helvétique, sous réserve du produit des 350'000 actions vendues dès le 24 novembre 1999,

Que l'enquête a en effet identifié des transferts totalisant USD 469'723,22 effectués auprès du Crédit Suisse en faveur d'Oliver HILSENRATH entre le 24 septembre 1997 et le 3 juin 1999 et qui proviennent de la vente de titres effectuée par le biais des sociétés TELECOM ASSOCIATES LTD et BORAZON LTD,

Que tous ces fonds ont été transférés vers la Suisse en provenance de la MATHESON BANK (JERSEY) LTD,

Que ces titres ne sont pas à confondre avec ceux acquis à une date ultérieure, soit dès le 13 mars 1998(pièces 2200000195ss - rapport de clôture),

Que, pour le surplus, Laurel BEELER passe sous silence un autre point important, à savoir la réalisation d'actions frappées d'un empêchement légal, plus précisément la restriction d'aliéner imposée par la règle 144 de la SEC (*sales of restricted and/or control securities*),

Qu'en relation avec ce dernier point, le Parquet fédéral a acquis la conviction que USWC, contrairement à la vérité et au droit en vigueur à l'époque, a faussement autorisé, par courrier émanant de David KLARMAN en date du 28 juin 1999, la levée de la restriction légale portant sur lesdites actions,

Qu'il en découle que les opérations sur valeurs mobilières, communément appelées *stock cross or sham sale,* qui se sont conséquemment déroulées ont eu lieu de manière contraire au droit,

Qu'en effet et contrairement aux éléments annoncés dans le formulaire S-3/A établi le 18 septembre 1997, ce sont d'autres actions, correspondant au certificat d'actionnaire no. 106 et acquises le 13 mars 1998, qui ont été vendues sur le marché américain entre le 30 novembre 1999 et le 9 février 2000 pour la somme de USD 6'677'787,20 dont USD 6'497'920.- ont transité par le compte d'Oliver HILSENRATH auprès du Crédit Suisse à Zurich,

Qu'il convient de préciser que le certificat d'actionnaire no. 106 a été scindé le 8 septembre 1998 et sur ordre d'Oliver HILSENRATH en deux sous-certificats nos. 196 et 197, représentant respectivement 350'000 et 46'576 actions d'USWC (pièces 2200000195ss - rapport de clôture),

Qu'en outre, la société USWC a expressément indiqué par courrier du 3 août 1999 que les actions initialement enregistrées à la vente au moyen du formulaire S-3/A établi en septembre 1997 ne pouvaient plus être vendues après le mois d'août 1999 (pièce 0900011235ss),

Que, pour tous ces motifs, il en découle que les 350'000 actions précitées ont été vendues à une période non autorisée car intervenant après l'échéance de la période couverte par le formulaire (*registration statement*) et que les multiples aliénations de titres intervenues nonobstant cela auraient dû être portées à la connaissance du public au moyen des formulaires dits 4 ou 5 de la SEC (pièce 1602000179),

Que ce qui précède, s'inscrit parfaitement dans la logique criminelle poursuivie par les inculpés car les ventes échelonnées de ces titres sont pour un autre motif problématiques dans la mesure où elles interviennent à une période où Oliver HILSENRATH, en sa qualité de Directeur général d'USWC, a procédé à une série d'annonces d'événements au grand public, événements prétendument de nature à intéresser l'évolution de la société mais qui ne se sont finalement pas concrétisés (pièce 1700000001ss),

Qu'en agissant de la sorte et en abusant de sa position, Oliver HILSENRATH cherchait selon toute vraisemblance à influencer le cours du titre ou du moins à soutenir la valeur boursière en dépit de la mise en vente de 350'000 actions sur le marché américain au cours de la brève période de vente susmentionnée,

Que l'enquête confirme également que des fonds totalisant USD 348'000.- ont été soustraits à la société USWC au moyen de 29 mensualités de USD 12'000.- transférés entre le 25 août 1997 et le 4 janvier 2000 versées à la société TELECOM ASSOCIATES LTD, à Jersey,

Qu'à la même période, des transferts totalisant USD 80'000.- ont également été soustraits à USWC au profit de KS LEGAL CONSULTANTS LTD,

Que ces transferts ont été ordonnés par Oliver HILSENRATH, parfois avec l'appui de David KLARMAN, et enregistrés dans la comptabilité sans justificatif approprié et sous des prétextes fallacieux, à savoir divers mandats fictifs (*consulting*), ce en violation des devoirs légaux et contractuels lui incombant en sa qualité de haut-dirigeant d'USWC notamment au regard des annonces officielles et obligatoires faites à la même période à la *Securities and Exchange Commission*,

Qu'en faisant passer leurs intérêts personnels devant ceux de la société, cela dans un but d'enrichissement personnel, les comportements des prévenus semblent bel et bien réunir toutes les conditions objectives et subjectives de gestion déloyale qualifiée, voire d'escroquerie, et de faux dans les titres selon le droit suisse,

Qu'au vu de ce qui précède, l'abandon de plusieurs points de l'accusation américaine exclusivement à l'encontre du prévenu Oliver HILSENRATH, ce dans le cadre du plea bargain conclu au mois de février 2007, paraît d'autant plus incompréhensible,

Que le choix peut être le reflet d'une certaine impatience, voire même d'un embarras de la part des autorités pénales américaines,

Qu'en tout état de fait et en dépit des efforts considérables déployés par les magistrats du Ministère public de la Confédération et de l'Office des Juges d'instruction fédéraux, les infractions dont Oliver HILSENRATH est fortement soupçonné n'ont pas pu être établies à satisfaction de droit,

Que, comme indiqué, ceci est imputable à l'attitude peu coopérative et discutable des autorités américaines qui ont donné l'impression d'être exclusivement mues par leurs intérêts nationaux, sans faire cas de ceux des autorités helvétiques pour permettre une issue judiciaire conforme à l'équité,

Que l'absence des derniers éléments de preuve indispensables pour consolider l'enquête pénale helvétique et permettre de confondre, une fois pour toutes, le prévenu Oliver HILSENRATH dans ses déclarations contradictoires, voire même controuvées, impose une suspension provisoire de l'affaire,

Qu'il n'est pas concevable de renvoyer Oliver HILSENRATH, cas échéant partiellement par défaut, devant le Tribunal pénal fédéral sans disposer au préalable des résultats des modiques mesures d'investigation sollicitées dans les commissions rogatoires émises au cours des derniers mois, lesquelles sont hélas restées lettre morte,

Que le prévenu n'a d'ailleurs jamais été confronté aux derniers éléments de l'instruction et a refusé de répondre à de multiples reprises aux questions précises qui lui ont été posées,

Que les quelques explications qu'il a fournies semblent avoir été fabriquées de toute pièce après l'ouverture des procédures pénales à son encontre et ne trouvent que bien peu d'appui dans les rares pièces qu'il a produites jusqu'à ce jour,

Que, de facto et contrairement à ce qu'il prétend, il a toujours refusé de produire les principaux actes pertinents qui auraient permis d'élucider les faits de l'affaire,

Qu'il n'est certes pas tenu de se montrer coopératif en raison des droits qui lui sont garantis par la procédure pénale helvétique,

Que, néanmoins, en raison de ses comportements ou omissions directs, il a compliqué et ralenti considérablement les investigations, obligeant les magistrats fédéraux à multiplier les mesures d'investigation et à décerner de nombreuses commissions rogatoires, principalement par le juge d'instruction fédéral, puis à requérir un avis de droit ainsi qu'une analyse approfondie des transactions et opérations boursières effectuées,

Qu'il doit dès lors supporter les conséquences financières résultant de ses agissements procéduraux,

Que, dans une mesure équitable, les frais ont été légèrement réduits pour ne pas lui faire supporter les conséquences financières résultant des manquements imputables aux autorités américaines,

Qu'au vu de l'ensemble des circonstances de l'enquête et à la lumière des faits constatés, notamment ceux détaillés ci-avant, les frais doivent ainsi être majoritairement mis à la charge d'Oliver HILSENRATH, soit quatre cinquièmes (4/5), le cinquième (1/5) restant étant mis à la charge du prévenu David KLARMAN,

Que, s'agissant des comportements réalisés par David KLARMAN sur sol helvétique, ceux-ci ont été largement confessés et confirmés par les mesures d'investigation entreprises,

Que les principaux actes décrivant les crimes préalables admis par ce prévenu, lesquels sont par ailleurs à l'origine des fonds d'origine criminelle transférés vers la Suisse, ont été mentionnés supra,

Que, par mesure de simplification et pour ne pas répéter inutilement des faits admis, la présente décision s'y réfère expressément et se base sur ces éléments,

Que, s'agissant des sommes intentionnellement blanchies par l'inculpé, il est précisé que David KLARMAN a fait transférer, entre mars 2001 et octobre 2002, la somme totale de USD 4'786'595.80 par des comptes bancaires lui appartenant auprès de l'UBS et du CS,

Qu'en procédant de la sorte, il voulait entraver l'identification de l'origine, la découverte et la confiscation des fonds d'origine criminelle provenant des méfaits qu'il a admis avoir commis de concert avec Oliver HILSENRATH au détriment de la société USWC,

Qu'il a notamment confirmé ces points au cours de son audition effectuée, par voie de commission rogatoire, à San Francisco en date du 17 mai 2005,

Que, pour les motifs déjà précisés, les explications controuvées d'Oliver HILSENRATH par rapport aux faits américains ne sont point crédibles et il est retenu que les transferts susmentionnés sont en relation étroite avec les crimes préalables commis sur sol américain et non

seulement ceux qu'il a finalement admis dans le cadre du plea bargain conclu au mois de février 2007 et soumis formellement à la Cour américaine,

Case 3:03-cr-00213-WHA    Document 42-3    Filed 09/20/2007    Page 29 of 80

Que le Procureur fédéral soussigné a ainsi acquis la conviction qu'Oliver HILSENRATH s'est rendu coupable, sur sol helvétique, de l'infraction de blanchiment d'argent au sens de l'article 305bis CP au vu des nombreux indices contenus dans le dossier de la procédure pénale suisse,

Qu'en effet, en procédant tel qu'indiqué supra, Oliver HILSENRATH voulait manifestement blanchir, soit entraver l'identification de l'origine, la découverte et la confiscation des fonds d'origine criminelle provenant des méfaits qu'il a commis seul ou de concert avec David KLARMAN au détriment de la société USWC (cf. supra),

Que cette conviction se fonde notamment sur les actes concrets déployés par le prévenu peu après la réception de fonds en Suisse, actes tendant à transférer ces valeurs très rapidement vers d'autres lieux tout en les transformant en d'autres biens (diamants et bien immobiliers),

Que ce qui précède ne permet toutefois pas de s'écarter de l'un des principes cardinaux de la procédure pénale, à savoir que le Parquet fédéral supporte toujours le fardeau de la preuve et doit ainsi renoncer à la mise en accusation et à renvoyer un accusé devant les Tribunaux pénaux si tous les éléments indispensables permettant une condamnation pénale relativement certaine font défaut au dossier de la procédure,

Que telle est la situation aujourd'hui pour l'accusé Oliver HILSENRATH,

Que le soussigné n'a ainsi d'autre choix que de suspendre les recherches, lesquelles pourront être reprises si la continuation des poursuites pénales devait connaître une évolution favorable,

Que cet état de fait ne doit toutefois pas permettre à l'inculpé de se soustraire impunément à toutes les conséquences directes liées à ses agissements pénaux établis et ceux encore supposés, ni aux engagements qu'il a pris dans le cadre du *plea agreement* conclu au mois de février 2007,

Qu'aux termes de cet acte judiciaire valant actuellement jugement, l'inculpé Oliver HILSENRATH est astreint à transférer les avoirs en sa possession, se montant au moins à USD 2 millions, aux autorités américaines,

Que force est de constater que ces valeurs sont largement couvertes par les avoirs qu'il a fait transférer hors de la Suisse, seul une part infime des valeurs patrimoniales se trouvant encore sur sol helvétique et devant au demeurant être affectée au recouvrement des frais d'enquête occasionnés à ce jour par l'inculpé Oliver HILSENRATH,

Que, les valeurs patrimoniales encore sous séquestre pénal conservatoire ordonné à l'étranger par voie d'entraide pénale sont précisément celles transférées à destination de la Pologne et de la Belgique,

Que, *pro memoria*, les commissions rogatoires adressées à ces deux Etats ont été motivées par les comportements pénaux mentionnés supra ainsi que par la découverte en cours d'enquête de plusieurs transferts en vue d'opérations diamantaires, soit :

- USD 1'540'700.- remis en plusieurs transactions entre décembre 2001 et janvier
  2002, à CANADA 20 et SOFAM FINANCIAL SERVICES LTD,
- et USD 610'000.-, en février 2004, à Robert FAWCETT,

Ainsi que des transferts pour des opérations immobilières réalisées en Pologne, soit :

- USD 985'000.-, remis lors de plusieurs transactions effectuées au mois de février
  2004, en faveur de KOSMO SPOLKA Z.O.O.W. ORGANIZACJI, Cracovie,

Que, s'agissant de cette dernière société et son rôle dans la présente affaire, référence est
faite aux actes de la procédure d'entraide versés au dossier de la cause pénale,

Que, pour le surplus, les autorités belges ont confirmé avoir procédé au blocage d'importants
avoirs appartenant à Oliver HILSENRATH,

Qu'il en va de même des autorités polonaises qui ont indiqué avoir procédé à divers bloca-
ges touchant aux avoirs détenus directement ou indirectement par Oliver HILSENRATH,

Qu'au vu du dossier pénal dans l'état actuel de l'instruction, en particulier les faits qui ten-
dent à confirmer l'origine criminelle de tous les fonds ayant transité par la Suisse - malgré les
dénégations de l'inculpé Oliver HILSENRATH et l'absence de coopération satisfaisante des
autorités américaines - les séquestres pénaux conservatoires ordonnés à l'étranger ne peu-
vent être levés qu'en mains des autorités américaines,

Que la révocation des requêtes d'entraide pénale sans autre formalité serait contraire à
l'ordre juridique suisse,

Que cette décision est la seule permettant de concilier les intérêts des autorités judiciaires
américaines et suisses et permet par ailleurs à Oliver HILSENRATH de satisfaire les condi-
tions fixées et engagements pris par lui lors de la conclusion du plea bargain, valant au-
jourd'hui jugement,

Que les autorités belges et polonaises en seront informées dès que la présente décision
sera définitive et exécutoire,

Qu'en résumé, s'agissant du prévenu Oliver HILSENRATH, l'enquête pénale le concernant
doit être provisoirement suspendue, toute continuation de la poursuite de l'instruction parais-
sant en l'état impossible, les fonds actuellement sous séquestre pénal conservatoire à
l'étranger devant être libérés exclusivement en mains des autorités pénales américaines et
les fonds sur sol helvétique devant être affectés au recouvrement des frais de procédure, le
solde éventuel, d'origine criminelle, sera confisqué en application de l'article 70 CP,

Que le sort à réserver à la procédure pénale en tant qu'elle concerne l'inculpé David KLAR-
MAN est toutefois différent car sa situation spécifique est parfaitement distincte de celle de
l'inculpé Oliver HILSENRATH,

Que, comme il résulte des actes de la procédure et des indications figurant supra, David
KLARMAN s'est toujours montré coopératif avec les autorités américaines et helvétiques
alors qu'il n'était pas tenu de le faire,

Que son attitude traduit d'une part une prise de conscience de la gravité des crimes commis et d'autre part une volonté réelle de rétablir la vérité et réparer, dans toute la mesure possible, le préjudice provoqué,

Que sa position dans la procédure pénale américaine ne donne lieu à aucun désaccord et il a d'ores et déjà pris les dispositions requises afin de réparer le préjudice financier,

Qu'il a en effet admis les faits et a conclu un *plea agreement* entériné par la Cour compétente,

Qu'il a ainsi été définitivement jugé au sens du droit helvétique même si, conformément à la pratique américaine, sa peine finale n'a pas été fixée,

Que l'inculpé David KLARMAN sait néanmoins que la peine qui sera finalement retenue respectera le cadre répressif déjà convenu et correspondra au *Total offense level n° 27* (cf. annexes rubrique 18, CRI USA, pièce 5 009), soit au moins 70 mois d'emprisonnement,

Qu'il est également observé que l'inculpé David KLARMAN a été condamné non seulement pour *mail fraud,* 18 U.S.C. § 1341, mais également pour blanchiment d'argent,18 U.S.C. § 1956, (cf. annexes rubrique 18, CRI USA, pièces 5 004 à 5 019),

Que ces infractions sont sanctionnées par des peines d'emprisonnement, dont les valeurs maximales sont respectivement de 5 ans et de 20 ans, auxquelles sont en outre assorties des peines pécuniaires proportionnées aux montants soustraits illicitement,

Que ce niveau répressif est au moins équivalent, en droit suisse, à une peine de l'ordre de 5 ans d'emprisonnement,

Qu'il en résulte que cet inculpé a, dans les faits, d'ores et déjà été condamné pour l'ensemble de son activité criminelle quand bien même ladite condamnation ne pouvait formellement englober les actes de blanchiment d'argent commis sur territoire helvétique, dont la répression relève des seules autorités judiciaires helvétiques,

Qu'en tout état, aucune peine complémentaire à la peine américaine n'est envisageable car le barème des peines infligées en Suisse est objectivement et comparativement moins lourd que celui appliqué aux peines prononcées aux Etats-Unis,

Qu'au vu de ce qui précède, le Procureur fédéral soussigné retient que seule une peine complémentaire et intégralement absorbée par la condamnation américaine n'est aujourd'hui envisageable pour sanctionner les comportements pénaux de David KLARMAN commis sur territoire suisse,

Que les principes de célérité et d'économie de la procédure commandent dès lors la cessation de l'action pénale dirigée à l'encontre de l'inculpé David KLARMAN, la peine prononcée par les autorités américaines étant suffisante pour réprimer l'infraction de blanchiment d'argent détaillée ci-dessus,

Que cet inculpé doit supporter les frais de la poursuite pénale qui le concernent, lesquels seront déduits des fonds encore sous séquestre pénal conservatoire, le solde éventuel, d'origine criminelle, sera confisqué en application de l'article 70 CP,

Que la présente décision sera traduite en langue anglaise avant notification par la voie diplomatique à l'inculpé Oliver HILSENRATH, étant précisé que seule la version française fait foi,

Pour Oliver HILSENRATH, par ces motifs et au vu des dispositions 3, 8, 70, 305bis, 337 et 344a CP, ainsi que 73,120, 123, 124 et 246bis PPF,

Pour David KLARMAN, par ces motifs et au vu des dispositions 3, 8, 49, 53, 70, 305bis, 337 et 344a CP, ainsi que 73,120, 124 et 246bis PPF,

**Le Procureur fédéral soussigné décide :**

1. L'instruction pénale dirigée à l'encontre d'Oliver HILSENRATH est <u>provisoirement suspendue</u> et pourra notamment être reprise en cas de faits nouveaux ou si le prévenu se met à la disposition des autorités judiciaires helvétiques.

2. <u>La cessation de l'action pénale</u> dirigée à l'encontre de David KLARMAN compte tenu de la quotité prévisible de la condamnation pénale américaine.

3. Les coûts, d'un montant de CHF 104'508.40, <u>sont mis principalement à la charge</u> de l'inculpé Oliver HILSENRATH.

4. Les coûts, d'un montant de CHF 62'518.25, <u>sont mis partiellement à la charge</u> de l'inculpé David KLARMAN.

5. Les frais mis à la charge des inculpés feront l'objet d'un décompte séparé et seront perçus en premier lieu sur les avoirs sur sol helvétique frappés d'un séquestre pénal conservatoire, tout reliquat éventuel étant <u>confisqué</u> en application de l'article 70 CP.

6. Les autres frais, non attribués aux inculpés, seront provisoirement pris en charge par la Caisse fédérale.

7. Les valeurs patrimoniales situées en Belgique ainsi qu'en Pologne et placées sous séquestre pénal conservatoire par voie d'entraide pénale internationale seront <u>libérées uniquement en vue de leur transfert puis placement sur un compte escrow au nom d'Oliver HILSENRATH auprès du *US District Court, Northern District of California, San Francisco, California / United States of America.*</u>

8. A notifier en recommandé:
   - à Me Luke H. GILLON, pour l'inculpé David KLARMAN, Etude Gillon Perritaz Esseiva Overney, Bd de Pérolles 21, CH - 1700 FRIBOURG.

   Par voie officielle, Office fédéral de la Justice (accompagnée d'une traduction en langue anglaise):
   - à Oliver HILSENRATH, 822 Eastbrook Court, USA - Danville, California.

Ministère public de la Confédération MPC

Brent Holtkamp
Procureur fédéral

**Voies de droit**

Lorsque les recherches sont suspendues, le procureur général est compétent pour faire procéder à la confiscation des objets et valeurs. Il communique sa décision par écrit, accompagnée d'un bref exposé des motifs, à la personne touchée. La décision de confiscation peut faire l'objet d'un recours devant la cour des plaintes dans les dix jours.

La victime et le lésé peuvent porter plainte contre la suspension de l'instruction dans les dix jours auprès de la Cour des plaintes du Tribunal pénal fédéral à 6501 Bellinzone (art. 106, al. 1$^{bis}$ PPF).

Aux termes de l'art. 105$^{bis}$, al. 2 en relation avec l'art. 214 ss. PPF, la présente ordonnance peut faire l'objet d'une plainte envoyée par écrit dans les cinq jours qui suivent sa réception à la Cour des plaintes du Tribunal pénal fédéral à 6501 Bellinzone pour autant que celle-ci concerne l'imputation des coûts. La plainte ne suspend l'exécution de la décision attaquée que si la Cour des plaintes ou son président l'ordonne (art. 218 PPF).

# <u>Exhibit B</u>

Current case Doc 417 – Hilsenrath letter to the OIA/CRIM DIV of 9/11/2007 re stay of service

Hana Hilsenrath & Oliver Hilsenrath
822 Eastbrook Ct. Danville California 94506
Tel: +1 925 212 6299, Fax: +1 925 736 7571
Email: oliver_hilsenrath@sbcglobal.net

September 11, 2007

**Office of International Affairs/Criminal Division**
**Ms. Mary Ellen Warlow**
**Ms. Judith Friedman**
**Ms. Diana Viggiano**
**Ms. Colette Ford**

**CC: Ms. Laurel Beeler – US Attorney/ N. District of CA**

By Fax: 202-514-0080 and email

**RE: OIA service of Holtkamp order/your ref MEW:PR:CF:DNV:mtn 182-18409, and also**
**Case 3:03-cr-00213-WHA USA v. Hilsenrath**

Dear Madam,

Yesterday, September 10, 2007 your office served on the undersigned a document containing an English and French version of a Swiss order signed by a Mr. Holtkamp (HOLTKAMP ORDER). The two first pages of that communication are attached for reference.

I hereby promptly write you to delay the completion of the service (report to Swiss authorities re completion of service) in order to allow the District Court in California to review a Writ of Injunction against the service of this document, its legality and the execution of any part of it.

The Writ will be filed within 24 hours and a copy will be served on your office.

I respectfully bring to your attention that the referenced HOLTKAMP ORDER is an unlawful action and therefore its service is in itself an act in furtherance. All matters in the HOLTKAMP ORDER were already adjudicated as part of Case 3:03-cr-00213-WHA USA v. Hilsenrath.

The HOLTKAMP ORDER states the following:

1.  HOLTKAMP investigated the undersigned for 3 years and was unable to bring any charges in Switzerland;
2.  HOLTKAMP blames the US government for sabotaging his above investigation;
3.  HOLTKAMP blames the undersigned for not "sufficiently impeaching himself" to facilitate charges in Switzerland;

4. HOLTKAMP nevertheless orders the confiscation of the undersigned's family and partners' assets in Switzerland to cover his botched investigation;

5. HOLTKAMP invites the US government to "participate" at the confiscation-spree by taking the undersigned's family business partners' assets in other European countries.

6. HOLTKAMP states that he will maintain an open ended criminal action against the undersigned, to be reopened at will, and alerts of an (unclear) open-ended arrest warrant for the arrest of the undersigned.

7. HOLTKAMP seems to indicate (the text is not entirely clear) that 10 days after the service, unless an appeal is made to the Swiss high court, his order shall be effective and shall be put in action.

Clearly, if completed, the OIA's service of this order will trigger a 10 days countdown after which this order will be effective – unless it is appealed to the Swiss high court.

As I am certain your well know, the Swiss have not allowed access to any of the frozen assets for over 3 years to hire legal assistance in either the US or in Switzerland. Therefore there is no good faith attempt to adjudicate the matter but rather to circumvent the courts.

The HOLTKAMP ORDER is therefore in breach of international, Swiss and US law as well as the Treaty in multiple ways:

1. HOLTKAMP orders unlawful confiscation without adjudication, and without even the existence of charges;

2. HOLTKAMP orders re-adjudication of already adjudicated maters in the US District Court in violation of the Treaty's comity. Further, all legal matters in Holtkamp's order have occurred in the US and under US law.

3. HOLTKAMP orders an unlawful open-ended criminal action against the undersigned to include a continuous threat of arrest at will, with no cause or charges - in violation of the unanimously adopted right of due process and speedy adjudication.

4. HOLTKAMP threatens to disseminate to multiple foreign countries a libelous document targeted to defame the undersigned, his business partners, and mostly the US government itself.

For all the above good reasons, I hereby request that the OIA put on hold the service of the above HOLTKAMP ORDER to allow a Writ of Injunction to be orderly filed and heard by the District Court in California in the relevant Case *3:03-cr-00213-WHA USA v. Hilsenrath*.


Sincerely,

OLIVER HILSENRATH
Acting *In Pro Per*



**U.S. Department of Justice**

Criminal Division
Office of International Affairs

MEW:PR:CF:DNV:mtn
182-18409

_Washington, D.C. 20530_

SEP – 6 2007

**CERTIFIED MAIL RECEIPT# 7003-3110-0003-6803-9462**

Oliver Hilsenrath
822 Eastbrook Court
Danville, CA 94506

Dear Mr. Hilsenrath:

Re:    Request from Switzerland for Service of Process

The Ministére public de la Confédération MPC, in Switzerland has asked this office to serve you with the enclosed documents. You should carefully review these documents for instructions and deadlines. If you have any questions concerning this matter, please contact the foreign court directly or the Swiss consulate in your area.

Sincerely,

Mary Ellen Warlow
Director
Office of International Affairs
Criminal Division

By: Colette Ford
Trial Attorney

Enclosures



Schweizerische Eidgenossenschaft
Confédération suisse
Confederazione Svizzera
Confederaziun svizra

Ministère public de la Confédération MPC

Federal Attorney:            Brent Holtkamp
Deputy Federal Attorney:     Giorgio Fumagalli
Clerk:                       Diane Conrad-Taggesell
Criminal Procedure n°:       MPC/EAII/7/05/0271
**Bern, 23 August 2007**

# PROVISIONAL SUSPENSION OF INVESTIGATION
## (OLIVER HILSENRATH)

## AND

# CESSATION OF CRIMINAL PROCEEDINGS
## (DAVID KLARMAN)

conducted into the per-
sons of:

**Oliver HILSENRATH,** born on 27 April 1957 in Romania, Israeli and American national, son of Andrei HILSENRATH and Melanie KAHANE, married to Hana HILSENRATH, domiciled at 822 Eastbrook Court, USA – 94506 Danville, California,

and

**David KLARMAN**, born on 30 September 1964 in Queens/NY, American national, son of Abraham Milton KLARMAN and Iris KATZ, economist and lawyer, married to Marie COCCHIARO, domiciled at 4 Abigails Path, USA - 11937 East Hampton, New York,

for:

money laundering (Art. 305bis of the Swiss Penal Code SPC)

**IN VIEW OF:**

the case file of the investigation opened by the criminal investigation police on 24 February 2004 into the person of David KLARMAN, and subsequently extended as of 16 August 2004 into the person of Oliver HILSENRATH;

the 8 November 2005 Request to initiate a pre-trial investigation;

the file on the pre-trial investigation being conducted since 13 December 2005 and the final report submitted by the Federal Examining Magistrate on 1 June 2007;

Case 3:03-cr-00213-WHA          Amended Motion/Writ of Injunction          9/20/07      Page 38 of 80
Ministère public de la Confédération MPC
Diane Conrad-Taggesell
Taubenstrasse 16, 3003 Bern
Tél. +41 31 322 06 80, Fax +41 31 322 05 03

**HP OfficeJet G Series G85**
**Personal Printer/Fax/Copier/Scanner**

**Fax-History Report** for
Hilsenrath/Heffal, Woose
001 925 736 7571
11 Sep 2007 16:20

<u>Last Fax</u>

| <u>Date</u> | <u>Time</u> | <u>Type</u> | <u>Identification</u> | <u>Duration</u> | <u>Pages</u> | <u>Result</u> |
|------|------|------|----------------|----------|-------|--------|
| 11 Sep | 16:19 | Sent | 12025140080 | 1:13 | 4 | OK |

Result:
  OK - black and white fax
  Okay color - color fax

# <u>Exhibit C</u>

Current case Doc 302 – This court's first order re Swiss freeze

1

2

3

4

5

6

7

8

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) No. CR 03-0213 WHA |
| | ) |
| v. | ) [PROPOSED] ORDER REGARDING |
| | ) THE SWISS AND EUROPEAN |
| | ) FREEZE OF OLIVER HILSENRATH'S |
| OLIVER HILSENRATH, | ) FUNDS |
| | ) |
| Defendant. | ) |
| | ) **Hearing Date:** August 21, 2006 |

This Court makes the following findings pursuant to Federal Rule of Civil Procedure 65:

1.  In 2005, the federal government of the United States asked the government of Switzerland to freeze assets of Oliver Hilsenrath.

2.  Almost all of the assets are attributable to the sale of 350,000 shares of U.S. Wireless stock that Oliver Hilsenrath acquired legitimately.

3.  In response to an inquiry from the Swiss authorities, the U.S. government told the Swiss authorities that while the 350,000 shares of U.S. Wireless stock at issue were obtained legitimately, it believed that the shares may have been transferred in violation of U.S. securities laws (even though those securities law violations were not charged in the U.S. case.

4.  After these American requests, Swiss investigating magistrates (or "prosecutors") wrote to other European jurisdictions. The Swiss investigating magistrates requested that Hilsenrath's assets

1       in those European jurisdictions also be frozen.

2   5.     The United States federal government has now concluded that these frozen assets were not

3       embezzled or stolen. The United States federal government has also concluded that these

4       frozen assets were not the proceeds of a securities fraud offense. Thus, the United States

5       withdrew its request to Switzerland to freeze assets.

6   6.     The continuing restraint of Hilsenrath's assets in Switzerland and Europe is preventing him

7       from hiring the counsel of his choice. This is causing a significant delay of two large federal

8       cases before this Court: the criminal prosecution, and a related S.E.C. civil case. This delay is

9       very inconvenient to the Court and to the parties.

10

11   The Court accordingly holds the following:

12

13   1.     There was no probable cause to support the pretrial restraint of assets attributable to the

14       350,000 shares when the MLAT requests for a freeze were sent to Switzerland in 2005;

15   2.     The continued freeze requires, for some limited term, a continuance of the criminal trial to

16       permit Hilsenrath to attempt to recover his assets and retain counsel;

17   3.     To the extent that the Swiss authorities' independent freeze of the assets is attributable to the

18       Swiss authorities' conclusion that there are violations of U.S. law that justify Swiss money

19       laundering charges, the Court respectfully requests the Swiss investigating magistrates to

20       release the funds frozen at the request of the U.S. government. The Court further requests that

21       the Swiss investigating magistrates withdraw their requests for freezes made to other European

22       jurisdictions.

23   IT IS SO ORDERED.

24

25   August 21, 2006

       Dated                         WILLIAM ALSUP

26                           United States District Court Judge



Judge William Alsup

# <u>Exhibit D</u>

Current case Doc 309 – This court's first order re Swiss freeze

1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10                     SAN FRANCISCO DIVISION

11   UNITED STATES OF AMERICA,      )        No. CR 03-0213 WHA
                                    )
12            Plaintiff,            )        ORDER
                                    )
13   v.                             )
                                    )
14   OLIVER HILSENRATH,             )
                                    )
15            Defendant.            )
     _____)

16

17        On August 21, 2006, the Court issued an order holding the following:

18   1.   There was no probable cause to support the pretrial restraint of assets attributable

19        to the 350,000 shares when the MLAT requests for a freeze were sent to

20        Switzerland in 2005;

21                 *              *              *

22   3.   To the extent that the Swiss authorities' independent freeze of the assets is

23        attributable to the Swiss authorities' conclusion that there are violations of U.S.

24        law that justify Swiss money laundering charges, the Court respectfully requests

25        the Swiss investigating magistrates to release the funds frozen at the request of the

26        U.S. government.  The Court further requests that the Swiss investigating

27        magistrates withdraw their requests for freezes made to other European countries.

28

The United States has advised the Court that the Swiss authorities have suggested that because the Court's order is not a judicial decision such as a plea or a sentencing, it is not a final or sufficient order to release the frozen assets.

The Court issues this order to clarify the following:

1. The U.S. government has investigated the matter of Mr. Hilsenrath's acquisition and sale of 350,000 shares of U.S. Wireless Corporation and has concluded that there are no violations of U.S. law other than tax evasion charges.

2. Accordingly, the U.S. government has decided not to bring charges about the 350,000 shares, except for the tax evasion charges.

3. The U.S. government informed the Swiss authorities that allegations in the MLAT requests – that the 350,000 shares were acquired unlawfully – were inaccurate.

4. The Court clarifies that there is no other mechanism (other than the issuance of this order) to pronounce on the propriety of the asset freeze. If the assets had been frozen in the United States, and the Court issued a similar order holding that there was no probable cause to freeze the assets, then the assets would have to be released and returned to Mr. Hilsenrath.

5. The Court asks the Swiss examining magistrates to deem its August 21, 2006, order a final order, not subject to any other judgment or plea.

6. Consequently, the Court reiterates its request to the Swiss authorities to release Mr. Hilsenrath's frozen funds and to withdraw their requests for freezes made to other European countries, to the extent that the Swiss authorities' freeze of assets is attributable to their mistaken conclusion that there are violations of U.S. law that justify Swiss money laundering charges.

IT IS SO ORDERED.

DATED: _____November 13, 2006_____

_____
WILLIAM H. ALSUP
United States District Judge

# Exhibit E

Summary of legal arguments of international law (entire text in Exhibits F and G)

# American Convention on Human Rights

## Signed at the Inter-American Specialized Conference on Human Rights (see also Exhibit F)

## Main reference points:

---

### Article 8. Right to a Fair Trial

2. Every person accused of a criminal offense has the right to be presumed innocent so long as his guilt has not been proven according to law. During the proceedings, every person is entitled, with full equality, to the following minimum guarantees:

2. prior notification in detail to the accused of the charges against him;

---

### Article 11. Right to Privacy

1. Everyone has the right to have his honor respected and his dignity recognized.

2. No one may be the object of arbitrary or abusive interference with his private life, his family, his home, or his correspondence, or of unlawful attacks on his honor or reputation.

3. Everyone has the right to the protection of the law against such interference or attacks.

---

### Article 21. Right to Property

1. Everyone has the right to the use and enjoyment of his property. The law may subordinate such use and enjoyment to the interest of society.

2. No one shall be deprived of his property except upon payment of just compensation, for reasons of public utility or social interest, and in the cases and according to the forms established by law.

3. Usury and any other form of exploitation of man by man shall be prohibited by law.

---

### Article 22. Freedom of Movement and Residence

1. Every person lawfully in the territory of a State Party has the right to move about in it, and to reside in it subject to the provisions of the law.

2. Every person has the right to leave any country freely, including his own.

3. The exercise of the foregoing rights may be restricted only pursuant to a law to the extent necessary in a democratic society to prevent crime or to protect national security, public safety, public order, public morals, public health, or the rights or freedoms of others.

## Article 25. Right to Judicial Protection

1. Everyone has the right to simple and prompt recourse, or any other effective recourse, to a competent court or tribunal for protection against acts that violate his fundamental rights recognized by the constitution or laws of the state concerned or by this Convention, even though such violation may have been committed by persons acting in the course of their official duties.

2. The States Parties undertake:

1. to ensure that any person claiming such remedy shall have his rights determined by the competent authority provided for by the legal system of the state;

2. to develop the possibilities of judicial remedy; and

3. to ensure that the competent authorities shall enforce such remedies when granted.

# Universal Declaration of Human Rights

# (see also Exhibit G)

# Main reference points:

---

## Article 11

1. Everyone charged with a penal offence has the right to be presumed innocent until proved guilty according to law in a public trial at which he has had all the guarantees necessary for his defense.

2. No one shall be held guilty of any penal offence on account of any act or omission, which did not constitute a penal offence, under national or international law, at the time when it was committed. Nor shall a heavier penalty be imposed than the one that was applicable at the time the penal offence was committed.

## Article 12

No one shall be subjected to arbitrary interference with his privacy, family, home or correspondence, nor to attacks upon his honor and reputation. Everyone has the right to the protection of the law against such interference or attacks.

## Article 13

1. Everyone has the right to freedom of movement and residence within the borders of each State.

2. Everyone has the right to leave any country, including his own, and to return to his country.

## Article 17

1. Everyone has the right to own property alone as well as in association with others.

2. No one shall be arbitrarily deprived of his property.

## Article 28

Everyone is entitled to a social and international order in which the rights and freedoms set forth in this Declaration can be fully realized.

# Exhibit F

**American Convention on Human Rights
Signed at the Inter-American Specialized
Conference on Human Rights**

# AMERICAN CONVENTION ON HUMAN RIGHTS

(Signed at the Inter-American Specialized Conference
on Human Rights, San José, Costa Rica, 22 November 1969)

## Preamble

The American states signatory to the present Convention,

Reaffirming their intention to consolidate in this hemisphere, within the framework of democratic institutions, a system of personal liberty and social justice based on respect for the essential rights of man;

Recognizing that the essential rights of man are not derived from one's being a national of a certain state, but are based upon attributes of the human personality, and that they therefore justify international protection in the form of a convention reinforcing or complementing the protection provided by the domestic law of the American states;

Considering that these principles have been set forth in the Charter of the Organization of American States, in the American Declaration of the Rights and Duties of Man, and in the Universal Declaration of Human Rights, and that they have been reaffirmed and refined in other international instruments, worldwide as well as regional in scope;

Reiterating that, in accordance with the Universal Declaration of Human Rights, the ideal of free men enjoying freedom from fear and want can be achieved only if conditions are created whereby everyone may enjoy his economic, social, and cultural rights, as well as his civil and political rights; and

Considering that the Third Special Inter-American Conference (Buenos Aires, 1967) approved the incorporation into the Charter of the Organization itself of broader standards with respect to economic, social, and educational rights and resolved that an inter-American convention on human rights should determine the structure, competence, and procedure of the organs responsible for these matters,

Have agreed upon the following:

# PART I:  STATE OBLIGATIONS AND RIGHTS PROTECTED

## CHAPTER I:  GENERAL OBLIGATIONS

### Article 1. Obligation to Respect Rights

1.The States Parties to this Convention undertake to respect the rights and freedoms recognized herein and to ensure to all persons subject to their jurisdiction the free and full exercise of those

rights and freedoms, without any discrimination for reasons of race, color, sex, language, religion, political or other opinion, national or social origin, economic status, birth, or any other social condition.

2.For the purposes of this Convention, "person" means every human being.

### Article 2. Domestic Legal Effects

Where the exercise of any of the rights or freedoms referred to in Article 1 is not already ensured by legislative or other provisions, the States Parties undertake to adopt, in accordance with their constitutional processes and the provisions of this Convention, such legislative or other measures as may be necessary to give effect to those rights or freedoms.

## CHAPTER II: CIVIL AND POLITICAL RIGHTS

### Article 3. Right to Juridical Personality

Every person has the right to recognition as a person before the law.

### Article 4. Right to Life

1.Every person has the right to have his life respected. This right shall be protected by law and, in general, from the moment of conception. No one shall be arbitrarily deprived of his life.

2.In countries that have not abolished the death penalty, it may be imposed only for the most serious crimes and pursuant to a final judgment rendered by a competent court and in accordance with a law establishing such punishment, enacted prior to the commission of the crime. The application of such punishment shall not be extended to crimes to which it does not presently apply.

3.The death penalty shall not be reestablished in states that have abolished it.

4.In no case shall capital punishment be inflicted for political offenses or related common crimes.

5.Capital punishment shall not be imposed upon persons who, at the time the crime was committed, were under 18 years of age or over 70 years of age; nor shall it be applied to pregnant women.

6.Every person condemned to death shall have the right to apply for amnesty, pardon, or commutation of sentence, which may be granted in all cases. Capital punishment shall not be imposed while such a petition is pending decision by the competent authority.

### Article 5. Right to Humane Treatment

1.Every person has the right to have his physical, mental, and moral integrity respected.

2.No one shall be subjected to torture or to cruel, inhuman, or degrading punishment or treatment. All persons deprived of their liberty shall be treated with respect for the inherent dignity of the human person.

3.Punishment shall not be extended to any person other than the criminal.

4.Accused persons shall, save in exceptional circumstances, be segregated from convicted persons, and shall be subject to separate treatment appropriate to their status as unconvicted persons.

5.Minors while subject to criminal proceedings shall be separated from adults and brought before specialized tribunals, as speedily as possible, so that they may be treated in accordance with their status as minors.

6.Punishments consisting of deprivation of liberty shall have as an essential aim the reform and social readaptation of the prisoners.

## Article 6. Freedom from Slavery

1.No one shall be subject to slavery or to involuntary servitude, which are prohibited in all their forms, as are the slave trade and traffic in women.

2.No one shall be required to perform forced or compulsory labor. This provision shall not be interpreted to mean that, in those countries in which the penalty established for certain crimes is deprivation of liberty at forced labor, the carrying out of such a sentence imposed by a competent court is prohibited. Forced labor shall not adversely affect the dignity or the physical or intellectual capacity of the prisoner.

3.For the purposes of this article, the following do not constitute forced or compulsory labor:

1.work or service normally required of a person imprisoned in execution of a sentence or formal decision passed by the competent judicial authority. Such work or service shall be carried out under the supervision and control of public authorities, and any persons performing such work or service shall not be placed at the disposal of any private party, company, or juridical person;

2.military service and, in countries in which conscientious objectors are recognized, national service that the law may provide for in lieu of military service;

3.service exacted in time of danger or calamity that threatens the existence or the well-being of the community; or
4.work or service that forms part of normal civic obligations.

## Article 7. Right to Personal Liberty

1.Every person has the right to personal liberty and security.

2.No one shall be deprived of his physical liberty except for the reasons and under the conditions established beforehand by the constitution of the State Party concerned or by a law established pursuant thereto.

3.No one shall be subject to arbitrary arrest or imprisonment.

4.Anyone who is detained shall be informed of the reasons for his detention and shall be promptly notified of the charge or charges against him.

5.Any person detained shall be brought promptly before a judge or other officer authorized by law to exercise judicial power and shall be entitled to trial within a reasonable time or to be released without prejudice to the continuation of the proceedings. His release may be subject to guarantees to assure his appearance for trial.

6.Anyone who is deprived of his liberty shall be entitled to recourse to a competent court, in order that the court may decide without delay on the lawfulness of his arrest or detention and order his release if the arrest or detention is unlawful. In States Parties whose laws provide that anyone who believes himself to be threatened with deprivation of his liberty is entitled to recourse to a competent court in order that it may decide on the lawfulness of such threat, this remedy may not be restricted or abolished. The interested party or another person in his behalf is entitled to seek these remedies.

7.No one shall be detained for debt. This principle shall not limit the orders of a competent judicial authority issued for nonfulfillment of duties of support.

Article 8. Right to a Fair Trial

1.Every person has the right to a hearing, with due guarantees and within a reasonable time, by a competent, independent, and impartial tribunal, previously established by law, in the substantiation of any accusation of a criminal nature made against him or for the determination of his rights and obligations of a civil, labor, fiscal, or any other nature.

2.Every person accused of a criminal offense has the right to be presumed innocent so long as his guilt has not been proven according to law. During the proceedings, every person is entitled, with full equality, to the following minimum guarantees:

1.the right of the accused to be assisted without charge by a translator or interpreter, if he does not understand or does not speak the language of the tribunal or court;

2.prior notification in detail to the accused of the charges against him;

3.adequate time and means for the preparation of his defense;

4.the right of the accused to defend himself personally or to be assisted by legal counsel of

his own choosing, and to communicate freely and privately with his counsel;

    5.the inalienable right to be assisted by counsel provided by the state, paid or not as the domestic law provides, if the accused does not defend himself personally or engage his own counsel within the time period established by law;

    6.the right of the defense to examine witnesses present in the court and to obtain the appearance, as witnesses, of experts or other persons who may throw light on the facts;

    7.the right not to be compelled to be a witness against himself or to plead guilty; and

    8.the right to appeal the judgment to a higher court.

  3.A confession of guilt by the accused shall be valid only if it is made without coercion of any kind.

  4.An accused person acquitted by a nonappealable judgment shall not be subjected to a new trial for the same cause.

  5.Criminal proceedings shall be public, except insofar as may be necessary to protect the interests of justice.

### Article 9. Freedom from Ex Post Facto Laws

No one shall be convicted of any act or omission that did not constitute a criminal offense, under the applicable law, at the time it was committed. A heavier penalty shall not be imposed than the one that was applicable at the time the criminal offense was committed. If subsequent to the commission of the offense the law provides for the imposition of a lighter punishment, the guilty person shall benefit therefrom.

### Article 10. Right to Compensation

Every person has the right to be compensated in accordance with the law in the event he has been sentenced by a final judgment through a miscarriage of justice.

### Article 11. Right to Privacy

  1.Everyone has the right to have his honor respected and his dignity recognized.

  2.No one may be the object of arbitrary or abusive interference with his private life, his family, his home, or his correspondence, or of unlawful attacks on his honor or reputation.

  3.Everyone has the right to the protection of the law against such interference or attacks.

### Article 12. Freedom of Conscience and Religion

1.Everyone has the right to freedom of conscience and of religion. This right includes freedom to maintain or to change one's religion or beliefs, and freedom to profess or disseminate one's religion or beliefs, either individually or together with others, in public or in private.

2.No one shall be subject to restrictions that might impair his freedom to maintain or to change his religion or beliefs.

3.Freedom to manifest one's religion and beliefs may be subject only to the limitations prescribed by law that are necessary to protect public safety, order, health, or morals, or the rights or freedoms of others.

4.Parents or guardians, as the case may be, have the right to provide for the religious and moral education of their children or wards that is in accord with their own convictions.

Article 13. Freedom of Thought and Expression

1.Everyone has the right to freedom of thought and expression. This right includes freedom to seek, receive, and impart information and ideas of all kinds, regardless of frontiers, either orally, in writing, in print, in the form of art, or through any other medium of one's choice.

2.The exercise of the right provided for in the foregoing paragraph shall not be subject to prior censorship but shall be subject to subsequent imposition of liability, which shall be expressly established by law to the extent necessary to ensure:

   1.respect for the rights or reputations of others; or

   2.the protection of national security, public order, or public health or morals.

3.The right of expression may not be restricted by indirect methods or means, such as the abuse of government or private controls over newsprint, radio broadcasting frequencies, or equipment used in the dissemination of information, or by any other means tending to impede the communication and circulation of ideas and opinions.

4.Notwithstanding the provisions of paragraph 2 above, public entertainments may be subject by law to prior censorship for the sole purpose of regulating access to them for the moral protection of childhood and  adolescence.

5.Any propaganda for war and any advocacy of national, racial, or religious hatred that constitute incitements to lawless violence or to any other similar action against any person or group of persons on any grounds including those of race, color, religion, language, or national origin shall be considered as offenses punishable by law.

Article 14. Right of Reply

1.Anyone injured by inaccurate or offensive statements or ideas disseminated to the public in general by a legally regulated medium of communication has the right to reply or to make a

correction using the same communications outlet, under such conditions as the law may establish.

   2.The correction or reply shall not in any case remit other legal liabilities that may have been incurred.

   3.For the effective protection of honor and reputation, every publisher, and every newspaper, motion picture, radio, and television company, shall have a person responsible who is not protected by immunities or special privileges.

Article 15. Right of Assembly

The right of peaceful assembly, without arms, is recognized. No restrictions may be placed on the exercise of this right other than those imposed in conformity with the law and necessary in a democratic society in the interest of national security, public safety or public order, or to protect public health or morals or the rights or freedom of others.

Article 16. Freedom of Association

   1.Everyone has the right to associate freely for ideological, religious, political, economic, labor, social, cultural, sports, or other purposes.

   2.The exercise of this right shall be subject only to such restrictions established by law as may be necessary in a democratic society, in the interest of national security, public safety or public order, or to protect public health or morals or the rights and freedoms of others.

   3.The provisions of this article do not bar the imposition of legal restrictions, including even deprivation of the exercise of the right of association, on members of the armed forces and the police.

Article 17. Rights of the Family

   1.The family is the natural and fundamental group unit of society and is entitled to protection by society and the state.

   2.The right of men and women of marriageable age to marry and to raise a family shall be recognized, if they meet the conditions required by domestic laws, insofar as such conditions do not affect the principle of nondiscrimination established in this Convention.
   3.No marriage shall be entered into without the free and full consent of the intending spouses.

   4.The States Parties shall take appropriate steps to ensure the equality of rights and the adequate balancing of responsibilities of the spouses as to marriage, during marriage, and in the event of its dissolution. In case of dissolution, provision shall be made for the necessary protection of any children solely on the basis of their own best interests.

   5.The law shall recognize equal rights for children born out of wedlock and those born in

wedlock.

### Article 18. Right to a Name

Every person has the right to a given name and to the surnames of his parents or that of one of them. The law shall regulate the manner in which this right shall be ensured for all, by the use of assumed names if necessary.

### Article 19. Rights of the Child

Every minor child has the right to the measures of protection required by his condition as a minor on the part of his family, society, and the state.

### Article 20. Right to Nationality

  1.Every person has the right to a nationality.

  2.Every person has the right to the nationality of the state in whose territory he was born if he does not have the right to any other nationality.

  3.No one shall be arbitrarily deprived of his nationality or of the right to change it.

### Article 21. Right to Property

  1.Everyone has the right to the use and enjoyment of his property. The law may subordinate such use and enjoyment to the interest of society.

  2.No one shall be deprived of his property except upon payment of just compensation, for reasons of public utility or social interest, and in the cases and according to the forms established by law.

  3.Usury and any other form of exploitation of man by man shall be prohibited by law.

### Article 22. Freedom of Movement and Residence

  1.Every person lawfully in the territory of a State Party has the right to move about in it, and to reside in it subject to the provisions of the law.
  2.Every person has the right lo leave any country freely, including his own.

  3.The exercise of the foregoing rights may be restricted only pursuant to a law to the extent necessary in a democratic society to prevent crime or to protect national security, public safety, public order, public morals, public health, or the rights or freedoms of others.

  4.The exercise of the rights recognized in paragraph 1 may also be restricted by law in designated zones for reasons of public interest.

5.No one can be expelled from the territory of the state of which he is a national or be deprived of the right to enter it.

6.An alien lawfully in the territory of a State Party to this Convention may be expelled from it only pursuant to a decision reached in accordance with law.

7.Every person has the right to seek and be granted asylum in a foreign territory, in accordance with the legislation of the state and international conventions, in the event he is being pursued for political offenses or related common crimes.

8.In no case may an alien be deported or returned to a country, regardless of whether or not it is his country of origin, if in that country his right to life or personal freedom is in danger of being violated because of his race, nationality, religion, social status, or political opinions.

9.The collective expulsion of aliens is prohibited.

### Article 23. Right to Participate in Government

1.Every citizen shall enjoy the following rights and opportunities:

1.to take part in the conduct of public affairs, directly or through freely chosen representatives;

2.to vote and to be elected in genuine periodic elections, which shall be by universal and equal suffrage and by secret ballot that guarantees the free expression of the will of the voters; and

3.to have access, under general conditions of equality, to the public service of his country.

2.The law may regulate the exercise of the rights and opportunities referred to in the preceding paragraph only on the basis of age, nationality, residence, language, education, civil and mental capacity, or sentencing by a competent court in criminal proceedings.

### Article 24. Right to Equal Protection

All persons are equal before the law. Consequently, they are entitled, without discrimination, to equal protection of the law.

### Article 25. Right to Judicial Protection

1.Everyone has the right to simple and prompt recourse, or any other effective recourse, to a competent court or tribunal for protection against acts that violate his fundamental rights recognized by the constitution or laws of the state concerned or by this Convention, even though such violation may have been committed by persons acting in the course of their official duties.

2.The States Parties undertake:

1.to ensure that any person claiming such remedy shall have his rights determined by the competent authority provided for by the legal system of the state;

2.to develop the possibilities of judicial remedy; and

3.to ensure that the competent authorities shall enforce such remedies when granted.

CHAPTER III
ECONOMIC, SOCIAL, AND CULTURAL RIGHTS

Article 26. Progressive Development

The States Parties undertake to adopt measures, both internally and through international cooperation, especially those of an economic and technical nature, with a view to achieving progressively, by legislation or other appropriate means, the full realization of the rights implicit in the economic, social, educational, scientific, and cultural standards set forth in the Charter of the Organization of American States as amended by the Protocol of Buenos Aires.

CHAPTER IV
SUSPENSION OF GUARANTEES, INTERPRETATION, AND APPLICATION

Article 27. Suspension of Guarantees

1.In time of war, public danger, or other emergency that threatens the independence or security of a State Party, it may take measures derogating from its obligations under the present Convention to the extent and for the period of time strictly required by the exigencies of the situation, provided that such measures are not inconsistent with its other obligations under international law and do not involve discrimination on the ground of race, color, sex, language, religion, or social origin.

2.The foregoing provision does not authorize any suspension of the following articles: Article 3 (Right to Juridical Personality), Article 4 (Right to Life), Article 5 (Right to Humane Treatment), Article 6 (Freedom from Slavery), Article 9 (Freedom from Ex Post Facto Laws), Article 12 (Freedom of Conscience and Religion), Article 17 (Rights of the Family), Article 18 (Right to a Name), Article 19 (Rights of the Child),
Article 20 (Right to Nationality), and Article 23 (Right to Participate in Government), or of the judicial guarantees essential for the protection of such rights.

3.Any State Party availing itself of the right of suspension shall immediately inform the other States Parties, through the Secretary General of the Organization of American States, of the provisions the application of which it has suspended, the reasons that gave rise to the suspension, and the date set for the termination of such suspension.

Article 28. Federal Clause

1. Where a State Party is constituted as a federal state, the national government of such State Party shall implement all the provisions of the Convention over whose subject matter it exercises legislative and judicial jurisdiction.

2. With respect to the provisions over whose subject matter the constituent units of the federal state have jurisdiction, the national government shall immediately take suitable measures, in accordance with its constitution and its laws, to the end that the competent authorities of the constituent units may adopt appropriate provisions for the fulfillment of this Convention.

3. Whenever two or more States Parties agree to form a federation or other type of association, they shall take care that the resulting federal or other compact contains the provisions necessary for continuing and rendering effective the standards of this Convention in the new state that is organized.

### Article 29. Restrictions Regarding Interpretation

No provision of this Convention shall be interpreted as:

1. permitting any State Party, group, or person to suppress the enjoyment or exercise of the rights and freedoms recognized in this Convention or to restrict them to a greater extent than is provided for herein;

2. restricting the enjoyment or exercise of any right or freedom recognized by virtue of the laws of any State Party or by virtue of another convention to which one of the said states is a party;

3. precluding other rights or guarantees that are inherent in the human personality or derived from representative democracy as a form of government; or

4. excluding or limiting the effect that the American Declaration of the Rights and Duties of Man and other international acts of the same nature may have.

### Article 30. Scope of Restrictions

The restrictions that, pursuant to this Convention, may be placed on the enjoyment or exercise of the rights or freedoms recognized herein may not be applied except in accordance with laws enacted for reasons of general interest and in accordance with the purpose for which such restrictions have been established.

### Article 31. Recognition of Other Rights

Other rights and freedoms recognized in accordance with the procedures established in Articles 76 and 77 may be included in the system of protection of this Convention.

### CHAPTER V
### PERSONAL RESPONSIBILITIES

Article 32. Relationship between Duties and Rights

1.Every person has responsibilities to his family, his community, and mankind.

2.The rights of each person are limited by the rights of others, by the security of all, and by the just demands of the general welfare, in a democratic society.

PART II
MEANS OF PROTECTION

CHAPTER VI
COMPETENT ORGANS

Article 33

The following organs shall have competence with respect to matters relating to the fulfillment of the commitments made by the States Parties to this Convention:

1.the Inter-American Commission on Human Rights, referred to as "The Commission;" and

2.the Inter-American Court of Human Rights, referred to as "The Court."

CHAPTER VII
INTER-AMERICAN COMMISSION ON HUMAN RIGHTS

Section 1. Organization

Article 34

The Inter-American Commission on Human Rights shall be composed of seven members, who shall be persons of high moral character and recognized competence in the field of human rights.

Article 35
The Commission shall represent all the member countries of the Organization of American States.

Article 36

1.The members of the Commission shall be elected in a personal capacity by the General Assembly of the Organization from a list of candidates proposed by the governments of the member states.

2.Each of those governments may propose up to three candidates, who may be nationals of the states proposing them or of any other member state of the Organization of American States. When a slate of three is proposed, at least one of the candidates shall be a national of a state other than the one proposing the slate.

Article 37

1.The members of the Commission shall be elected for a term of four years and may be reelected only once, but the terms of three of the members chosen in the first election shall expire at the end of two years. Immediately following that election the General Assembly shall determine the names of those three members by lot.

2.No two nationals of the same state may be members of the Commission.

Article 38

Vacancies that may occur on the Commission for reasons other than the normal expiration of a term shall be filled by the Permanent Council of the Organization in accordance with the provisions of the Statute of the Commission.

Article 39

The Commission shall prepare its Statute, which it shall submit to the General Assembly for approval. It shall establish its own Regulations.

Article 40

Secretariat services for the Commission shall be furnished by the appropriate specialized unit of the General Secretariat of the Organization. This unit shall be provided with the resources required to accomplish the tasks assigned to it by the Commission.

Section 2. Functions

Article 41

The main function of the Commission shall be to promote respect for and defense of human rights. In the exercise of its mandate, it shall have the following functions and powers:

1.to develop an awareness of human rights among the peoples of America;

2.to make recommendations to the governments of the member states, when it considers such action advisable, for the adoption of progressive measures in favor of human rights within the framework of their domestic law and constitutional provisions as well as appropriate measures to further the observance of those rights;

3.to prepare such studies or reports as it considers advisable in the performance of its duties;

4.to request the governments of the member states to supply it with information on the measures adopted by them in matters of human rights;

5. to respond, through the General Secretariat of the Organization of American States, to inquiries made by the member states on matters related to human rights and, within the limits of its possibilities, to provide those states with the advisory services they request;

6. to take action on petitions and other communications pursuant to its authority under the provisions of Articles 44 through 51 of this Convention; and

7. to submit an annual report to the General Assembly of the Organization of American States.

### Article 42

The States Parties shall transmit to the Commission a copy of each of the reports and studies that they submit annually to the Executive Committees of the Inter-American Economic and Social Council and the Inter-American Council for Education, Science, and Culture, in their respective fields, so that the Commission may watch over the promotion of the rights implicit in the economic, social, educational, scientific, and cultural standards set forth in the Charter of the Organization of American States as amended by the Protocol of Buenos Aires.

### Article 43

The States Parties undertake to provide the Commission with such information as it may request of them as to the manner in which their domestic law ensures the effective application of any provisions of this Convention.

### Section 3. Competence

### Article 44

Any person or group of persons, or any nongovernmental entity legally recognized in one or more member states of the Organization, may lodge petitions with the Commission containing denunciations or complaints of violation of this Convention by a State Party.

### Article 45

1. Any State Party may, when it deposits its instrument of ratification of or adherence to this Convention, or at any later time, declare that it recognizes the competence of the Commission to receive and examine communications in which a State Party alleges that another State Party has committed a violation of a human right set forth in this Convention.

2. Communications presented by virtue of this article may be admitted and examined only if they are presented by a State Party that has made a declaration recognizing the aforementioned competence of the Commission. The Commission shall not admit any communication against a State Party that has not made such a declaration.

3. A declaration concerning recognition of competence may be made to be valid for an indefinite time, for a specified period, or for a specific case.

4.Declarations shall be deposited with the General Secretariat of the Organization of American States, which shall transmit copies thereof to the member states of that Organization.

### Article 46

1.Admission by the Commission of a petition or communication lodged in accordance with Articles 44 or 45 shall be subject to the following requirements:

1.that the remedies under domestic law have been pursued and exhausted in accordance with generally recognized principles of international law;

2.that the petition or communication is lodged within a period of six months from the date on which the party alleging violation of his rights was notified of the final judgment;

3.that the subject of the petition or communication is not pending in another international proceeding for settlement; and

4.that, in the case of Article 44, the petition contains the name, nationality, profession, domicile, and signature of the person or persons or of the legal representative of the entity lodging the petition.

2.The provisions of paragraphs 1.a and 1.b of this article shall not be applicable when:

1.the domestic legislation of the state concerned does not afford due process of law for the protection of the right or rights that have allegedly been violated;

2.the party alleging violation of his rights has been denied access to the remedies under domestic law or has been prevented from exhausting them; or

3.there has been unwarranted delay in rendering a final judgment under the aforementioned remedies.

### Article 47

The Commission shall consider inadmissible any petition or communication submitted under Articles 44 or 45 if:

1.any of the requirements indicated in Article 46 has not been met;

2.the petition or communication does not state facts that tend to establish a violation of the rights guaranteed by this Convention;

3.the statements of the petitioner or of the state indicate that the petition or communication is manifestly groundless or obviously out of order; or

4.the petition or communication is substantially the same as one previously studied by the

Commission or by another international organization.

Section 4. Procedure

Article 48

1.When the Commission receives a petition or communication alleging violation of any of the rights protected by this Convention, it shall proceed as follows:

1.If it considers the petition or communication admissible, it shall request information from the government of the state indicated as being responsible for the alleged violations and shall furnish that government a transcript of the pertinent portions of the petition or communication. This information shall be submitted within a reasonable period to be determined by the Commission in accordance with the circumstances of each case.

2.After the information has been received, or after the period established has elapsed and the information has not been received, the Commission shall ascertain whether the grounds for the petition or communication still exist. If they do not, the Commission shall order the record to be closed.

3.The Commission may also declare the petition or communication inadmissible or out of order on the basis of information or evidence subsequently received.

4.If the record has not been closed, the Commission shall, with the knowledge of the parties, examine the matter set forth in the petition or communication in order to verify the facts. If necessary and advisable, the Commission shall carry out an investigation, for the effective conduct of which it shall request, and the states concerned shall furnish to it, all necessary facilities.

5.The Commission may request the states concerned to furnish any pertinent information and, if so requested, shall hear oral statements or receive written statements from the parties concerned.

6.The Commission shall place itself at the disposal of the parties concerned with a view to reaching a friendly settlement of the matter on the basis of respect for the human rights recognized in this Convention.

2.However, in serious and urgent cases, only the presentation of a petition or communication that fulfills all the formal requirements of admissibility shall be necessary in order for the Commission to conduct an investigation with the prior consent of the state in whose territory a violation has allegedly been committed.

Article 49

If a friendly settlement has been reached in accordance with paragraph 1.f of Article 48, the Commission shall draw up a report, which shall be transmitted to the petitioner and to the States

Parties to this Convention, and shall then be communicated to the Secretary General of the
Organization of American States for publication. This report shall contain a brief statement of
the facts and of the solution reached. If any party in the case so requests, the fullest possible
information shall be provided to it.

Article 50

1.If a settlement is not reached, the Commission shall, within the time limit established by its
Statute, draw up a report setting forth the facts and stating its conclusions. If the report, in whole
or in part, does not represent the unanimous agreement of the members of the Commission, any
member may attach to it a separate opinion. The written and oral statements made by the parties
in accordance with paragraph 1.e of Article 48 shall also be attached to the report.

2.The report shall be transmitted to the states concerned, which shall not be at liberty to
publish it.

3.In transmitting the report, the Commission may make such proposals and recommendations
as it sees fit.

Article 51

1.If, within a period of three months from the date of the transmittal of the report of the
Commission to the states concerned, the matter has not either been settled or submitted by the
Commission or by the state concerned to the Court and its jurisdiction accepted, the Commission
may, by the vote of an absolute majority of its members, set forth its opinion and conclusions
concerning the question submitted for its consideration.

2.Where appropriate, the Commission shall make pertinent recommendations and shall
prescribe a period within which the state is to take the measures that are incumbent upon it to
remedy the situation examined.

3.When the prescribed period has expired, the Commission shall decide by the vote of an
absolute majority of its members whether the state has taken adequate measures and whether to
publish its report.

CHAPTER VIII
INTER-AMERICAN COURT OF HUMAN RIGHTS

Section 1. Organization

Article 52

1.The Court shall consist of seven judges, nationals of the member states of the Organization,
elected in an individual capacity from among jurists of the highest moral authority and of
recognized competence in the field of human rights, who possess the qualifications required for
the exercise of the highest judicial functions in conformity with the law of the state of which

they are nationals or of the state that proposes them as candidates.

2.No two judges may be nationals of the same state.

### Article 53

1.The judges of the Court shall be elected by secret ballot by an absolute majority vote of the States Parties to the Convention, in the General Assembly of the Organization, from a panel of candidates proposed by those states.

2.Each of the States Parties may propose up to three candidates, nationals of the state that proposes them or of  any other member state of the Organization of American States. When a slate of three is proposed, at least one of the candidates shall be a national of a state other than the one proposing the slate.

### Article 54

1.The judges of the Court shall be elected for a term of six years and may be reelected only once. The term of three of the judges chosen in the first election shall expire at the end of three years. Immediately after the election, the names of the three judges shall be determined by lot in the General Assembly.

2.A judge elected to replace a judge whose term has not expired shall complete the term of the latter.

3.The judges shall continue in office until the expiration of their term. However, they shall continue to serve with regard to cases that they have begun to hear and that are still pending, for which purposes they shall not be replaced by the newly elected judges.

### Article 55

1.If a judge is a national of any of the States Parties to a case submitted to the Court, he shall retain his right to hear that case.

2.If one of the judges called upon to hear a case should be a national of one of the States Parties to the case, any other State Party in the case may appoint a person of its choice to serve on the Court as an ad hoc judge.

3.If among the judges called upon to hear a case none is a national of any of the States Parties to the case, each of the latter may appoint an ad hoc judge.

4.An ad hoc judge shall possess the qualifications indicated in Article 52.

5.If several States Parties to the Convention should have the same interest in a case, they shall be considered as a single party for purposes of the above provisions. In case of doubt, the Court shall decide.

Article 56

Five judges shall constitute a quorum for the transaction of business by the Court.

Article 57

The Commission shall appear in all cases before the Court.

Article 58

1. The Court shall have its seat at the place determined by the States Parties to the Convention in the General Assembly of the Organization; however, it may convene in the territory of any member state of the Organization of American States when a majority of the Court considers it desirable, and with the prior consent of the state concerned. The seat of the Court may be changed by the States Parties to the Convention in the General Assembly by a two-thirds vote.

2. The Court shall appoint its own Secretary.

3. The Secretary shall have his office at the place where the Court has its seat and shall attend the meetings that the Court may hold away from its seat.

Article 59

The Court shall establish its Secretariat, which shall function under the direction of the Secretary of the Court, in accordance with the administrative standards of the General Secretariat of the Organization in all respects not incompatible with the independence of the Court. The staff of the Court's Secretariat shall be appointed by the Secretary General of the Organization, in consultation with the Secretary of the Court.

Article 60

The Court shall draw up its Statute which it shall submit to the General Assembly for approval. It shall adopt its own Rules of Procedure.

Section 2. Jurisdiction and Functions

Article 61

1. Only the States Parties and the Commission shall have the right to submit a case to the Court.

2. In order for the Court to hear a case, it is necessary that the procedures set forth in Articles 48 and 50 shall have been completed.

Article 62

1.A State Party may, upon depositing its instrument of ratification or adherence to this Convention, or at any subsequent time, declare that it recognizes as binding, ipso facto, and not requiring special agreement, the jurisdiction of the Court on all matters relating to the interpretation or application of this Convention.

2.Such declaration may be made unconditionally, on the condition of reciprocity, for a specified period, or for specific cases. It shall be presented to the Secretary General of the Organization, who shall transmit copies thereof to the other member states of the Organization and to the Secretary of the Court.

3.The jurisdiction of the Court shall comprise all cases concerning the interpretation and application of the provisions of this Convention that are submitted to it, provided that the States Parties to the case recognize or have recognized such jurisdiction, whether by special declaration pursuant to the preceding paragraphs, or by a special agreement.

## Article 63

1.If the Court finds that there has been a violation of a right or freedom protected by this Convention, the Court shall rule that the injured party be ensured the enjoyment of his right or freedom that was violated. It shall also rule, if appropriate, that the consequences of the measure or situation that constituted the breach of such right or freedom be remedied and that fair compensation be paid to the injured party.

2.In cases of extreme gravity and urgency, and when necessary to avoid irreparable damage to persons, the Court shall adopt such provisional measures as it deems pertinent in matters it has under consideration. With respect to a case not yet submitted to the Court, it may act at the request of the Commission.

## Article 64

1.The member states of the Organization may consult the Court regarding the interpretation of this Convention or of other treaties concerning the protection of human rights in the American states. Within their spheres of competence, the organs listed in Chapter X of the Charter of the Organization of American States, as amended by the Protocol of Buenos Aires, may in like manner consult the Court.

2.The Court, at the request of a member state of the Organization, may provide that state with opinions regarding the compatibility of any of its domestic laws with the aforesaid international instruments.

## Article 65

To each regular session of the General Assembly of the Organization of American States the Court shall submit, for the Assembly's consideration, a report on its work during the previous year. It shall specify, in particular, the cases in which a state has not complied with its judgments, making any pertinent recommendations.

Section 3. Procedure

Article 66

1.Reasons shall be given for the judgment of the Court.

2.If the judgment does not represent in whole or in part the unanimous opinion of the judges, any judge shall be entitled to have his dissenting or separate opinion attached to the judgment.

Article 67

The judgment of the Court shall be final and not subject to appeal. In case of disagreement as to the meaning or scope of the judgment, the Court shall interpret it at the request of any of the parties, provided the request is made within ninety days from the date of notification of the judgment.

Article 68

1.The States Parties to the Convention undertake to comply with the judgment of the Court in any case to which they are parties.

2.That part of a judgment that stipulates compensatory damages may be executed in the country concerned in accordance with domestic procedure governing the execution of judgments against the state.

Article 69

The parties to the case shall be notified of the judgment of the Court and it shall be transmitted to the States Parties to the Convention.

CHAPTER IX
COMMON PROVISIONS

Article 70

1.The judges of the Court and the members of the Commission shall enjoy, from the moment of their election and throughout their term of office, the immunities extended to diplomatic agents in accordance with international law. During the exercise of their official function they shall, in addition, enjoy the diplomatic privileges necessary for the performance of their duties.

2.At no time shall the judges of the Court or the members of the Commission be held liable for any decisions or opinions issued in the exercise of their functions.

Article 71

The position of judge of the Court or member of the Commission is incompatible with any other activity that might affect the independence or impartiality of such judge or member, as determined in the respective statutes.

### Article 72

The judges of the Court and the members of the Commission shall receive emoluments and travel allowances in the form and under the conditions set forth in their statutes, with due regard for the importance and independence of their office. Such emoluments and travel allowances shall be determined in the budget of the Organization of American States, which shall also include the expenses of the Court and its Secretariat. To this end, the Court shall draw up its own budget and submit it for approval to the General Assembly through the General Secretariat. The latter may not introduce any changes in it.

### Article 73

The General Assembly may, only at the request of the Commission or the Court, as the case may be, determine sanctions to be applied against members of the Commission or judges of the Court when there are justifiable grounds for such action as set forth in the respective statutes. A vote of a two-thirds majority of the member states of the Organization shall be required for a decision in the case of members of the Commission and, in the case of judges of the Court, a two-thirds majority vote of the States Parties to the Convention shall also be required.

PART III
GENERAL AND TRANSITORY PROVISIONS

CHAPTER X
SIGNATURE, RATIFICATION, RESERVATIONS,
AMENDMENTS, PROTOCOLS, AND DENUNCIATION

### Article 74

1.This Convention shall be open for signature and ratification by or adherence of any member state of the Organization of American States.

2.Ratification of or adherence to this Convention shall be made by the deposit of an instrument of ratification or adherence with the General Secretariat of the Organization of American States. As soon as eleven states have deposited their instruments of ratification or adherence, the Convention shall enter into force. With respect to any state that ratifies or adheres thereafter, the Convention shall enter into force on the date of the deposit of its instrument of ratification or adherence.Ratification of or adherence to this Convention shall be made by the deposit of an instrument of ratification or adherence with the General Secretariat of the Organization of American States. As soon as eleven states have deposited their instruments of ratification or adherence, the Convention shall enter into force. With respect to any state that ratifies or adheres thereafter, the Convention shall enter into force on the date of the deposit of its instrument of ratification or adherence.

3.The Secretary General shall inform all member states of the Organization of the entry into force of the Convention.

### Article 75

This Convention shall be subject to reservations only in conformity with the provisions of the Vienna Convention on the Law of Treaties signed on May 23, 1969.

### Article 76

1.Proposals to amend this Convention may be submitted to the General Assembly for the action it deems appropriate by any State Party directly, and by the Commission or the Court through the Secretary General.

2.Amendments shall enter into force for the States ratifying them on the date when two-thirds of the States Parties to this Convention have deposited their respective instruments of ratification. With respect to the other States Parties, the amendments shall enter into force on the dates on which they deposit their respective instruments of ratification.

### Article 77

1.In accordance with Article 31, any State Party and the Commission may submit proposed protocols to this Convention for consideration by the States Parties at the General Assembly with a view to gradually including other rights and freedoms within its system of protection.

2.Each protocol shall determine the manner of its entry into force and shall be applied only among the States Parties to it.

### Article 78

1.The States Parties may denounce this Convention at the expiration of a five-year period from the date of its entry into force and by means of notice given one year in advance. Notice of the denunciation shall be addressed to the Secretary General of the Organization, who shall inform the other States Parties.

2.Such a denunciation shall not have the effect of releasing the State Party concerned from the obligations contained in this Convention with respect to any act that may constitute a violation of those obligations and that has been taken by that state prior to the effective date of denunciation.

## CHAPTER XI
## TRANSITORY PROVISIONS

### Section 1. Inter-American Commission on Human Rights

### Article 79

Upon the entry into force of this Convention, the Secretary General shall, in writing, request each member state of the Organization to present, within ninety days, its candidates for membership on the Inter-American Commission on Human Rights. The Secretary General shall prepare a list in alphabetical order of the candidates presented, and transmit it to the member states of the Organization at least thirty days prior to the next session of the General Assembly.

Article 80

The members of the Commission shall be elected by secret ballot of the General Assembly from the list of candidates referred to in Article 79. The candidates who obtain the largest number of votes and an absolute majority of the votes of the representatives of the member states shall be declared elected. Should it become necessary to have several ballots in order to elect all the members of the Commission, the candidates who receive the smallest number of votes shall be eliminated successively, in the manner determined by the General Assembly.

Section 2. Inter-American Court of Human Rights

Article 81

Upon the entry into force of this Convention, the Secretary General shall, in writing, request each State Party to  present, within ninety days, its candidates for membership on the Inter-American Court of Human Rights. The Secretary General shall prepare a list in alphabetical order of the candidates presented and transmit it to the States Parties at least thirty days prior to the next session of the General Assembly.

Article 82

The judges of the Court shall be elected from the list of candidates referred to in Article 81, by secret ballot of the States Parties to the Convention in the General Assembly. The candidates who obtain the largest number of votes and an absolute majority of the votes of the representatives of the States Parties shall be declared elected. Should it become necessary to have several ballots in order to elect all the judges of the Court, the candidates who receive the smallest number of votes shall be eliminated successively, in the manner determined by the States Parties.

# Exhibit G

## Universal Declaration of Human Rights

# Universal Declaration of Human Rights - English (English)

## Universal Declaration of Human Rights

### Preamble

Whereas recognition of the inherent dignity and of the equal and inalienable rights of all members of the human family is the foundation of freedom, justice and peace in the world,

Whereas disregard and contempt for human rights have resulted in barbarous acts which have outraged the conscience of mankind, and the advent of a world in which human beings shall enjoy freedom of speech and belief and freedom from fear and want has been proclaimed as the highest aspiration of the common people,

Whereas it is essential, if man is not to be compelled to have recourse, as a last resort, to rebellion against tyranny and oppression, that human rights should be protected by the rule of law,

Whereas it is essential to promote the development of friendly relations between nations,

Whereas the peoples of the United Nations have in the Charter reaffirmed their faith in fundamental human rights, in the dignity and worth of the human person and in the equal rights of men and women and have determined to promote social progress and better standards of life in larger freedom,

Whereas Member States have pledged themselves to achieve, in cooperation with the United Nations, the promotion of universal respect for and observance of human rights and fundamental freedoms,

Whereas a common understanding of these rights and freedoms is of the greatest importance for the full realization of this pledge,

Now, therefore,

The General Assembly,

Proclaims this Universal Declaration of Human Rights as a common standard of achievement for all peoples and all nations, to the end that every individual and every organ of society, keeping this Declaration constantly in mind, shall strive by teaching and education to promote respect for these rights and freedoms and by progressive measures, national and international, to secure their universal and effective recognition and observance, both among the peoples of Member States themselves and among the peoples of territories under their jurisdiction.

## Article 1

All human beings are born free and equal in dignity and rights. They are endowed with reason and conscience and should act towards one another in a spirit of brotherhood.

## Article 2

Everyone is entitled to all the rights and freedoms set forth in this Declaration, without distinction of any kind, such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status.

Furthermore, no distinction shall be made on the basis of the political, jurisdictional or international status of the country or

territory to which a person belongs, whether it be independent, trust, non-self-governing or under any other limitation of sovereignty.

## Article 3

Everyone has the right to life, liberty and security of person.

## Article 4

No one shall be held in slavery or servitude; slavery and the slave trade shall be prohibited in all their forms.

## Article 5

No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment.

## Article 6

Everyone has the right to recognition everywhere as a person before the law.

## Article 7

All are equal before the law and are entitled without any discrimination to equal protection of the law. All are entitled to equal protection against any discrimination in violation of this Declaration and against any incitement to such discrimination.

## Article 8

Everyone has the right to an effective remedy by the competent national tribunals for acts violating the fundamental rights granted him by the constitution or by law.

## Article 9

No one shall be subjected to arbitrary arrest, detention or exile.

## Article 10

Everyone is entitled in full equality to a fair and public hearing by an independent and impartial tribunal, in the determination of his rights and obligations and of any criminal charge against him.

## Article 11

1. Everyone charged with a penal offence has the right to be presumed innocent until proved guilty according to law in a public trial at which he has had all the guarantees necessary for his defence.
2. No one shall be held guilty of any penal offence on account of any act or omission which did not constitute a penal offence, under national or international law, at the time when it was committed. Nor shall a heavier penalty be imposed than the one that was applicable at the time the penal offence was committed.

## Article 12

No one shall be subjected to arbitrary interference with his privacy, family, home or correspondence, nor to attacks upon his honour and reputation. Everyone has the right to the protection of the law against such interference or attacks.

## Article 13

1. Everyone has the right to freedom of movement and residence within the borders of each State.
2. Everyone has the right to leave any country, including his own, and to return to his country.

## Article 14

1. Everyone has the right to seek and to enjoy in other countries asylum from persecution.
2. This right may not be invoked in the case of prosecutions genuinely arising from non-political crimes or from acts contrary to the purposes and principles of the United Nations.

## Article 15

1. Everyone has the right to a nationality.
2. No one shall be arbitrarily deprived of his nationality nor denied the right to change his nationality.

## Article 16

1. Men and women of full age, without any limitation due to race, nationality or religion, have the right to marry and to found a family. They are entitled to equal rights as to marriage, during marriage and at its dissolution.
2. Marriage shall be entered into only with the free and full consent of the intending spouses.
3. The family is the natural and fundamental group unit of society and is entitled to protection by society and the State.

## Article 17

1. Everyone has the right to own property alone as well as in association with others.
2. No one shall be arbitrarily deprived of his property.

## Article 18

Everyone has the right to freedom of thought, conscience and religion; this right includes freedom to change his religion or belief, and freedom, either alone or in community with others and in public or private, to manifest his religion or belief in teaching, practice, worship and observance.

## Article 19

Everyone has the right to freedom of opinion and expression; this right includes freedom to hold opinions without interference and to seek, receive and impart information and ideas through any media and regardless of frontiers.

## Article 20

1. Everyone has the right to freedom of peaceful assembly and association.
2. No one may be compelled to belong to an association.

## Article 21

1. Everyone has the right to take part in the government of his country, directly or through freely chosen representatives.
2. Everyone has the right to equal access to public service in his country.
3. The will of the people shall be the basis of the authority of government; this will shall be expressed in periodic and genuine elections which shall be by universal and equal suffrage and shall be held by secret vote or by equivalent free voting procedures.

## Article 22

Everyone, as a member of society, has the right to social security and is entitled to realization, through national effort and international co-operation and in accordance with the organization and resources of each State, of the economic, social and cultural rights indispensable for his dignity and the free development of his personality.

## Article 23

1. Everyone has the right to work, to free choice of employment, to just and favourable conditions of work and to protection against unemployment.
2. Everyone, without any discrimination, has the right to equal pay for equal work.
3. Everyone who works has the right to just and favourable remuneration ensuring for himself and his family an existence worthy of human dignity, and supplemented, if necessary, by other means of social protection.
4. Everyone has the right to form and to join trade unions for the protection of his interests.

## Article 24

Everyone has the right to rest and leisure, including reasonable limitation of working hours and periodic holidays with pay.

## Article 25

1. Everyone has the right to a standard of living adequate for the health and well-being of himself and of his family, including food, clothing, housing and medical care and necessary social services, and the right to security in the event of unemployment, sickness, disability, widowhood, old age or other lack of livelihood in circumstances beyond his control.
2. Motherhood and childhood are entitled to special care and assistance. All children, whether born in or out of wedlock, shall enjoy the same social protection.

## Article 26

1. Everyone has the right to education. Education shall be free, at least in the elementary and fundamental stages. Elementary education shall be compulsory. Technical and professional education shall be made generally available and higher education shall be equally accessible to all on the basis of merit.
2. Education shall be directed to the full development of the human personality and to the strengthening of respect for human rights and fundamental freedoms. It shall promote understanding, tolerance and friendship among all nations, racial or religious groups, and shall further the activities of the United Nations for the maintenance of peace.
3. Parents have a prior right to choose the kind of education that shall be given to their children.

## Article 27

1. Everyone has the right freely to participate in the cultural life of the community, to enjoy the arts and to share in scientific advancement and its benefits.
2. Everyone has the right to the protection of the moral and material interests resulting from any scientific, literary or artistic production of which he is the author.

## Article 28

Everyone is entitled to a social and international order in which the rights and freedoms set forth in this Declaration can be fully realized.

## Article 29

1. Everyone has duties to the community in which alone the free and full development of his personality is possible.
2. In the exercise of his rights and freedoms, everyone shall be subject only to such limitations as are determined by law solely for the purpose of securing due recognition and respect for the rights and freedoms of others and of meeting the just requirements of morality, public order and the general welfare in a democratic society.
3. These rights and freedoms may in no case be exercised contrary to the purposes and principles of the United Nations.

## Article 30

Nothing in this Declaration may be interpreted as implying for any State, group or person any right to engage in any activity or to perform any act aimed at the destruction of any of the rights and freedoms set forth herein.

---

© The Office of the High Commissioner for Human Rights

OHCHR-UNOG
8-14 Avenue de la Paix
1211 Geneva 10, Switzerland

+41 22 917-9000
udhr@ohchr.org