HANA HILSENRATH
OLIVER HILSENRATH
822 Eastbrook Court
Danville, CA 94506
Telephone: 925 212 6299
Facsimile: 925 736 7571
ohlx@sbcglobal.net

PLAINTIFFS *IN PRO PER*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HANA HILSENRATH, OLIVER HILSENRATH<br><br>Plaintiffs,<br><br>v.<br><br>CREDIT SUISSE (CS), UNITED BANK OF SWITZERLAND (UBS) AND DOES 1-10<br><br>Defendants. | Case No: 3:07-cv-05374-WHA<br>AND<br>Case No: 3:08-mc-80005-WHA<br><br>**OLIVER HILSENRATH'S DECLARATION RE JUDICIAL NOTICE - ERRORS IN ORDER [DOC 3] REQUIRING PRE-FILING REVIEW**<br><br>Judge: Hon. William H. Alsup |

I, Oliver Hilsenrath declare the following to be true under penalty of perjury:

Attachments A to E are true copies of pleadings in cases USA v. Hilsenrath, Janvrin et al v. Hilsenrath et al. and Hilsenrath et al. v. Nixon Peabody et al.

Dated: February 6, 2008

Signed,

OLIVER HILSENRATH
Plaintiff *PRO SE*

_____ /s/ Oliver Hilsenrath

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# ATTACHMENT A

**FEDERAL PUBLIC DEFENDER**
NORTHERN DISTRICT OF CALIFORNIA
19TH FLOOR FEDERAL BUILDING - BOX 36106
450 GOLDEN GATE AVENUE
SAN FRANCISCO, CA 94102

2006 FEB 17  PM 3: 5

BARRY J. PORTMAN
*Federal Public Defender*
STEVEN G. KALAR
*Assistant Federal Public Defender*

Telephone: (415) 436-7700
Fax:       (415) 436-7706
E-mail:    Steven_Kalar@fd.org

Friday, February 17, 2006

United States Attorney
  Northern District of California
ATTN: AUSA Laurel Beeler
Federal Building, 11th Floor
450 Golden Gate Ave.
San Francisco, CA 94102

United States Attorney
  Northern District of California
ATTN: AUSA Stephanie M. Hinds
Civil Division, 10th Floor
450 Golden Gate Ave.
San Francisco, CA 94102

RE: *United States v. Oliver Hilsenrath*, CR 03-0213 WHA

Dear Ms. Beeler, Ms. Hinds:

I am writing regarding the Swiss freeze of assets in the above-entitled case, after an MLAT request by the United States government. I have encouraged Ms. Beeler to consider informing the Swiss that the Swiss funds are no longer the target of forfeiture in the United States, and withdrawing the U.S. government's MLAT request for the freeze. As I've explained, a withdrawal of the request for seizure of the funds would obviate the need for *Nebbia* litigation on the restraint of funds that would be used to hire private counsel. This *Nebbia* litigation, I believe, would be a poor use of everyone's resources. We have had candid and productive talks regarding this possibility, and I forward this letter in the spirit of those talks.

A new Ninth Circuit case decided this week might enter into the calculus on the seizure of the Swiss funds. In *United States v. Rutledge*, __ F.3d. __, Slip. Op. 1657 (9th Cir. Feb. 14, 2006), Judge Canby wrote for the Court and analyzed issues arising from criminal forfeiture. The real issue in this opinion was what constitutes "proceeds" of mail or wire fraud, for the purposes of criminal forfeiture under 18 USC § 981(a)(1)(C), (a)(2)(A). *Id.* at 1664. In a holding that may have relevance to our case – but which I do not address today – the Ninth rejected the government's broad interpretation of "proceeds;" an interpretation that included funds over

Letter of AFPD Kalar
February 17, 2006
Pg. 2

which the defendant took "control." *Id.* at 1665.

Of more immediate interest for the *Hilsenrath* case is the Court's casual recitation of amendments to the criminal forfeiture statute:

> Rutledge's threshold argument is that criminal forfeiture is not authorized by statute for the mail and wire fraud crimes with which he is charged. Prior to the year 2000, Rutledge clearly would have been correct. *The mail and wire fraud statute by itself provides for criminal forfeiture only for mail and wire fraud that affects a financial institution or involves telemarketing. See* 18 U.S.C. § 982(a)(2)(A), (a)(3)(E) & (F), (a)(8). Rutledge is not accused of committing this type of fraud.

*Id.* at 1662 (footnote omitted) (emphasis added).

The Court in *Rutledge* stated that the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA") "greatly changed" the scope of criminal forfeiture. *Id.* at 1662-63. As the Court explained, criminal forfeiture was intended to track the scope of possible civil forfeiture:

> Section 2461(c) increased the government's authority to seek criminal forfeiture by providing:
>
>> If a forfeiture of property is authorized in connection with a violation of an Act of Congress, and any person is charged in an indictment or information with such violation but no specific statutory provision is made for criminal forfeiture upon conviction, the Government may include the forfeiture in the indictment or information.

*Id.* at 1663. CAFRA became effective 120 days after April 25, 2000. *See* 28 USC § 2461, Historical and Statutory Notes ("2000 Acts. Amendments by Pub.L. 106-185, applicable to any forfeiture proceeding commenced on or after the date that is 120 days after April 25, 2000, see section 21 of Pub.L. 106-185, set out as a note under section 1324 of Title 8.") The effective date of the Act is accordingly August 22, 2000.

Does CAFRA cover fraud allegations in the *Hilsenrath* case, permitting criminal forfeiture? I do not believe so.

Turning to the *Hilsenrath* case, as I read the original indictment there appear to be no fraud or conspiracy overt acts on or after August 22, 2000. It appears that the majority of the allegations span from 1997 through no later than January 2000. It further appears that all of the wire transfers alleged in the indictment were completed before or during 1999 – long before the effective date of CAFRA, August 22, 2000.

Letter of AFPD Kalar
February 17, 2006
Pg. 3

In the Swiss MLAT request of March 31, 2005, the United States Department of Justice requested the freeze of Swiss funds in anticipation of forfeiture under United States law:

> The prosecutor further requests that any funds traceable to the subject matter of this request be frozen *as a preliminary step to forfeiture* under United States law, subject to the operation of Swiss law.
>
> . . . .
>
> The prosecutor requests a freeze of any and all funds located in Credit Suisse, UBS Switzerland, and any other bank in Switzerland traceable to the subject matter of this request for assistance to prevent their removal or dissipation.

MLAT Request of March 31, 2005 at 2, 12 (emphasis added).

The Fourth Superseding Indictment (filed May 11, 2005 – several months after the MLAT request) discusses allegations that Mr. Hilsenrath directed "shell corporations" to sell stock received through unauthorized transfers. *See Fourth Superseding Indict.* at 3:17-20. Some of these transfers are alleged to have occurred after August 22, 2000. *Id.* In addition, the conspiracy to commit wire fraud is alleged to have begun in August 1996 and to have continued through June 2001. *Id.* at 4:13-14.

As I read the indictment, however, there are no overt acts relating to wire or mail fraud, or conspiracy allegations *after* August 22, 2000 – the effective date of CAFRA.

The Fourth Superseding Indictment ends with Forfeiture Allegations. *Id.* at 10:11. The indictment alleges that Mr. Hilsenrath shall forfeit proceeds from any offense of conviction alleged in Counts 1 through 8. *Id.* Count One alleges a conspiracy to commit mail, wire, and securities fraud; Counts Two through Eight are the substantive wire and mail fraud allegations. *Id.* at 4-6. The criminal forfeiture allegations are made under 18 USC § 982(a)(2).

After reviewing *Rutledge*, Section 982(a)(2), CAFRA, the indictments, and the MLAT request, I have new concerns regarding the freeze of the Swiss funds. Specifically, I now wonder if the criminal forfeiture statute permitted forfeiture of wire and mail fraud proceeds *at the time of the alleged crimes*? If not, the forfeiture allegations in the Fourth Superceding Indictment are questionable. And, if those forfeiture allegations are not based on a valid statute, does that not place the validity of the Swiss MLAT freeze request into question as well?

I readily concede that I am not an expert in criminal forfeiture; few of my indigent clients face this type of charge. Therefore, as I first considered the ramifications of *Rutledge* I wondered if the constitutional protections of the *ex post facto* clause apply to criminal forfeiture.

Letter of AFPD Kalar
February 17, 2006
Pg. 4

Based on my preliminary research, they do. *See United States v. Colon-Munoz*, 192 F.3d 210, 226-27 (1st Cir. 1999).

I also found *Colon-Munoz* instructive for the principal that "A conspiracy does not continue indefinitely simply because the fruits of the conspiratorial objective continue into the future." *Id.* at 228. In this First Circuit case, the Court refused to find that the fruits of a bank fraud conspiracy carried proceeds into a time period covered by the forfeiture statute. *Id.* at 228-29 ("The application of forfeiture to the farm on the basis of the conspiracy charged in Count One of the indictment violates the Ex Post Facto Clause of the Constitution.")

Similarly, in the *Hilsenrath* case the only apparent way to salvage criminal forfeiture charges is apparently on the theory that the fraud conspiracy brought the case within the ambit of CAFRA. There are, however, no overt acts in that alleged conspiracy that follow August 22, 2000 (the effective date of CAFRA). Therefore, as I read *Colon-Munoz*, any criminal forfeiture of funds traceable to wire or mail fraud from before August 22, 2000 would violate the Ex Post Facto Clause, U.S. Const. art I, § 9, cl. 3.

We have previously discussed my concerns that the government's original theory relating to the Swiss funds has evolved since the MLAT request. I believe that it is accurate to state that the federal government no longer believes that the Swiss funds are the proceeds of theft or embezzlement. We have discussed the possibility of withdrawing the federal government's request for the Swiss freeze of funds in light of this evolving theory.

I believe that the potential *ex post facto* bar to criminal forfeiture of funds traceable to Counts One through Eight is another reason to revisit the government's request for a Swiss freeze of the funds.

*Rutledge* and CAFRA raise complicated and novel legal issues that appear to directly bear on the MLAT request for a freeze. Perhaps the most productive way to work through these issues would be to meet and confer and discuss the cases, the statute, and the forfeiture allegations? I would be glad to meet with you and discuss these matters at your convenience.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# ATTACHMENT B

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR 03-0213 WHA |
| Plaintiff, | ) | |
| | ) | [PROPOSED] ORDER REGARDING |
| v. | ) | THE SWISS AND EUROPEAN |
| | ) | FREEZE OF OLIVER HILSENRATH'S |
| OLIVER HILSENRATH, | ) | FUNDS |
| Defendant. | ) | |
| | ) | **Hearing Date:** August 21, 2006 |

This Court makes the following findings pursuant to Federal Rule of Civil Procedure 65:

1. In 2005, the federal government of the United States asked the government of Switzerland to freeze assets of Oliver Hilsenrath.

2. Almost all of the assets are attributable to the sale of 350,000 shares of U.S. Wireless stock that Oliver Hilsenrath acquired legitimately.

3. In response to an inquiry from the Swiss authorities, the U.S. government told the Swiss authorities that while the 350,000 shares of U.S. Wireless stock at issue were obtained legitimately, it believed that the shares may have been transferred in violation of U.S. securities laws (even though those securities law violations were not charged in the U.S. case.

4. After these American requests, Swiss investigating magistrates (or "prosecutors") wrote to other European jurisdictions. The Swiss investigating magistrates requested that Hilsenrath's assets

1  in those European jurisdictions also be frozen.

2  5.   The United States federal government has now concluded that these frozen assets were not

3      embezzled or stolen.  The United States federal government has also concluded that these

4      frozen assets were not the proceeds of a securities fraud offense.  Thus, the United States

5      withdrew its request to Switzerland to freeze assets.

6  6.   The continuing restraint of Hilsenrath's assets in Switzerland and Europe is preventing him

7      from hiring the counsel of his choice.  This is causing a significant delay of two large federal

8      cases before this Court:  the criminal prosecution, and a related S.E.C. civil case. This delay is

9      very inconvenient to the Court and to the parties.

10

11  The Court accordingly holds the following:

12

13  1.   There was no probable cause to support the pretrial restraint of assets attributable to the

14      350,000 shares when the MLAT requests for a freeze were sent to Switzerland in 2005;

15  2.   The continued freeze requires, for some limited term, a continuance of the criminal trial to

16      permit Hilsenrath to attempt to recover his assets and retain counsel;

17  3.   To the extent that the Swiss authorities' independent freeze of the assets is attributable to the

18      Swiss authorities' conclusion that there are violations of U.S. law that justify Swiss money

19      laundering charges, the Court respectfully requests the Swiss investigating magistrates to

20      release the funds frozen at the request of the U.S. government.  The Court further requests that

21      the Swiss investigating magistrates withdraw their requests for freezes made to other European

22      jurisdictions.

23  IT IS SO ORDERED.

24

25  August 21, 2006
    Dated

26                                      WILLIAM ALSUP
                                        United States District Court Judge



*Hilsenrath*, CR 03-0213 WHA
ORD. RE: FROZEN ASSETS                                  2

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

UNITED STATES OF AMERICA,           )        No. CR 03-0213 WHA
                                    )
            Plaintiff,              )        ORDER
                                    )
    v.                              )
                                    )
OLIVER HILSENRATH,                  )
                                    )
            Defendant.              )
_____)

On August 21, 2006, the Court issued an order holding the following:

1.  There was no probable cause to support the pretrial restraint of assets attributable
    to the 350,000 shares when the MLAT requests for a freeze were sent to
    Switzerland in 2005;

                    *               *               *

3.  To the extent that the Swiss authorities' independent freeze of the assets is
    attributable to the Swiss authorities' conclusion that there are violations of U.S.
    law that justify Swiss money laundering charges, the Court respectfully requests
    the Swiss investigating magistrates to release the funds frozen at the request of the
    U.S. government.  The Court further requests that the Swiss investigating
    magistrates withdraw their requests for freezes made to other European countries.

ORDER (CR 03 213 WHA)

The United States has advised the Court that the Swiss authorities have suggested that because the Court's order is not a judicial decision such as a plea or a sentencing, it is not a final or sufficient order to release the frozen assets.

The Court issues this order to clarify the following:

1. The U.S. government has investigated the matter of Mr. Hilsenrath's acquisition and sale of 350,000 shares of U.S. Wireless Corporation and has concluded that there are no violations of U.S. law other than tax evasion charges.

2. Accordingly, the U.S. government has decided not to bring charges about the 350,000 shares, except for the tax evasion charges.

3. The U.S. government informed the Swiss authorities that allegations in the MLAT requests – that the 350,000 shares were acquired unlawfully – were inaccurate.

4. The Court clarifies that there is no other mechanism (other than the issuance of this order) to pronounce on the propriety of the asset freeze.  If the assets had been frozen in the United States, and the Court issued a similar order holding that there was no probable cause to freeze the assets, then the assets would have to be released and returned to Mr. Hilsenrath.

5. The Court asks the Swiss examining magistrates to deem its August 21, 2006, order a final order, not subject to any other judgment or plea.

6. Consequently, the Court reiterates its request to the Swiss authorities to release Mr. Hilsenrath's frozen funds and to withdraw their requests for freezes made to other European countries, to the extent that the Swiss authorities' freeze of assets is attributable to their mistaken conclusion that there are violations of U.S. law that justify Swiss money laundering charges.

IT IS SO ORDERED.

DATED: _____ November 13, 2006

_____
WILLIAM H. ALSUP
United States District Judge

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# ATTACHMENT C

1  HANA HILSENRATH
   OLIVER HILSENRATH
2  822 Eastbrook Court
   Danville, CA 94506
3  Telephone: 925 212 6299
   Facsimile: 925 736 7571
4  ohlx@sbcglobal.net

5  PLAINTIFFS *IN PRO PER*

6

7

8                    SUPERIOR COURT OF THE STATE OF CALFORNIA

9                         COUNTY OF SAN FRANCISCO

10                            DEPARTMENT 301

11  HANA HILSENRATH AND OLIVER          Case No. CPF-07-507709
    HILSENRATH,
12                                      [PROPOSED] ORDER GRANTING
                                        PETITIONERS' MOTION TO SERVE
13             Petitioners,             COMPLAINT FOR MALICIOUS
                                        PROSECUTION, CIVIL CONSPIRACY
14        v.                            AND EXTORTION

15  NIXON PEABODY LLP, GLENN
    WESTREICH, BETH MITCHELL, AND       Hearing Date: January 4, 2008
16  DOES 1-10,                          Time: 9:30 a.m.
                                        Place: Department 301
17             Respondents

18

19

20

21

22

23

24

25

26

27

28

CA SUPP CT HILSENRATH V. NIXON PEABODY

---

ENDORSED
F I L E D
*San Francisco County Superior Court*

JAN 0 4 2008

GORDON PARK-LI, Clerk
BY:  JOCELYN C. ROQUE
                    Deputy Clerk

On January 4, 2008 the Court held a hearing on the matter of petitioners "Motion for leave to file a complaint for malicious prosecution, civil conspiracy and extortion pursuant to civil code §1714.10".

Petitioners presented proof of service of this Court's order of December 7, 2007 and the Notice of Hearing of January 4, 2008 on proposed defendants' counsel of record.

Having considered the papers and the arguments of the parties, and upon no opposition by the proposed defendants, the Court rules as follows:

Petitioners' Hana and Oliver Hilsenrath motion to serve the *COMPLAINT FOR MALICIOUS PROSECUTION, CIVIL CONSPIRACY AND EXTORTION* on Nixon Peabody LLP, Glenn Westreich and Beth Mitchell is **GRANTED**.

The Clerk shall issue a summons accordingly.


IT IS SO ORDERED


DATED: _____ **JAN 0 4** 2008 _____



PAUL H. ALVARADO
_____
HON. ~~PETER J. BUSCH~~        (J CK)
JUDGE OF THE SUPERIOR COURT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# ATTACHMENT D

1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                        NORTHERN DISTRICT OF CALIFORNIA

10

11    JANVRIN HOLDINGS LTD, et      )
      al.,                          )
12                                  )            No.  C02-1068 CW (BZ)
              Plaintiff(s),         )
13                                  )            **REPORT AND RECOMMENDATION**
          v.                        )            **FOR ENTRY OF DEFAULT**
14                                  )            **JUDGMENT**
      DR. OLIVER HILSENRATH, et     )
15    al.,                          )
                                    )
16            Defendant(s).         )
      _____)
17    OLIVER HILSENRATH and HANA    )
      HILSENRATH,                   )
18                                  )
              Counterclaimants,     )
19                                  )
          v.                        )
20                                  )
      JANVRIN HOLDINGS LTD.,et      )
21    al.,                          )
              Counterdefendants.)
22                                  )
      _____)
23

24          By Minute Order dated March 2, 2007, the Honorable

25    Claudia Wilken referred to me for report and recommendation

26    counterclaimants' application for entry of default judgment

27    against counterdefendants.  The following is my report and

28    recommendation for entry of default judgment.

                                    1

1      Plaintiffs Janvrin Holdings, Ltd., Crossgar, Ltd., and

2  Ryburn, Ltd., filed the initial complaint in this matter on

3  March 5, 2002.  The Hilsenraths counterclaimed against all

4  three plaintiffs.  In an order dated March 12, 2007, the court

5  dismissed the second amended complaint for failure to

6  prosecute and ordered a default entered on the counterclaims.[1]

7  See Docket No. 290.  The clerk entered counterdefendants'

8  default on March 13, 2007.  Counterclaimants filed for entry

9  of default judgment, and I held a hearing on May 2, 2007.

10  Despite having been served with notice of the hearing,

11  counterdefendants failed to appear.  See Docket No. 279.  At

12  all material times, counterclaimants acted pro se.

13      By defaulting, counterdefendants are deemed to have

14  admitted the well-pleaded averments of the complaint, except

15  those as to the amount of damages.  See Fed. R. Civ. P. 8(d).

16  Default is not, however, "an absolute confession of liability,

17  for the facts alleged in the complaint may be insufficient to

18  establish liability."  In re McGee, 359 B.R. 764, 771 (9th Cir.

19  B.A.P. 2006); see also Cripps v. Life Ins. Co. of North

20  America, 980 F.2d 1261, 1267 (9th Cir. 1992) ("[C]laims which

21  are legally insufficient[] are not established by default.").

22  At the same time, pleadings of pro se litigants are to be held

23  to a less rigorous standard than those drafted by attorneys.

24  See Haines v. Kerner, 404 U.S. 519, 520 (1972).  The decision

25  to grant or deny a default judgment under Rule 55(b) is within

26

27      [1]   Counterdefendants filed an answer to the initial
counterclaim on November 23, 2005.  Counterdefendants, however,
28  filed nothing in response to the amended counterclaim.

1   the discretion of the court.  <u>See</u> Fed. R. Civ. P. 55(b); <u>Eitel</u>

2   <u>v. McCool</u>, 782 F.2d 1470, 1471 (9th Cir. 1986).[2]

3       First, I conclude that the facts alleged in the amended

4   counterclaim, liberally construed, sufficiently pleads a cause

5   of action for invasion of privacy under the California

6   Constitution.[3]  Counterclaimants allege that managers and

7   directors of the counterdefendants knowingly, and without

8   consent, obtained counterclaimants' private financial

9   information held in a fiduciary capacity by Equity Trust.[4]

10  <u>See</u> Amended Counterclaim at ¶¶ 1, 4, 21.  Counterdefendants

11  thereafter used the information to "blackmail" and otherwise

12  pressure Dr. Hilsenrath and U.S. Wireless Corporation (USWC)

---

14  [2]    Pursuant to Rule 55(b)(2), when the defaulting party
    has appeared in the action, as here, it shall be served with
15  written notice of the application for judgment.  Fed. R. Civ.
    P. 55(b)(2).  Plaintiff served notice of its application to
16  counterdefendants' counsel, as instructed by Judge Wilken.

17  [3]    "'[A]rticle I, section 1 of the California
    Constitution creates a right of action against private as well
18  as government entities.'"  <u>Barbee v. Household Automotive</u>
    <u>Finance Corp.</u>, 113 Cal. App. 4th 525, 530 (2003) (quoting <u>Hill</u>
19  <u>v. National Collegiate Athletic Assn.</u>, 7 Cal.4th 1, 20 (1994)).
    "'[A] plaintiff alleging an invasion of privacy in violation of
20  the state constitutional right to privacy must establish each
    of the following: (1) a legally protected privacy interest; (2)
21  a reasonable expectation of privacy in the circumstances; and
    (3) conduct by defendant constituting a serious invasion of
22  privacy.'"  <u>Id.</u> (quoting <u>Hill</u>, 7 Cal.4th at 39-40).  California
    courts recognize an informational right to privacy that
23  encompasses financial and banking records.  <u>See</u> <u>Hill</u>, 7 Cal.4th
    at 34-36; <u>Valley Bank of Nevada v. Superior Court</u>, 15 Cal.3d
24  652, 656 (1975) ("[W]e may safely assume that the right of
    privacy extends to one's confidential financial affairs as well
25  as to the details of one's personal life.").

26  [4]    Causes of action one through four sometimes refer to
    injury suffered by Dr. Hilsenrath, and sometimes to injuries
27  suffered by both the Hilsenraths or the family.  Construing
    this pro se complaint liberally, I construe these causes of
28  action as pleading injury to both Dr. and Mrs. Hilsenrath.

1    to settle a lawsuit, and to pressure the Board into launching

2    a "secret investigation" leading to the termination of Dr.

3    Hilsenrath as CEO of USWC.  Id. at ¶¶ 5, 6.  These admitted

4    allegations establish that counterdefendants invaded

5    counterclaimants' legally protected and reasonable expectation

6    that their private financial information would not be accessed

7    by others, and that the invasion was serious.[5]

8         In addition, the fifth cause of action sufficiently

9    pleads a claim for intentional infliction of emotional

10   distress.[6]  Counterclaimant Hana Hilsenrath alleges she

11   suffered "fear, anguish, and illness" as a result of

12   counterdefendants' violation of her and her family's privacy.

13   See Amended Counterclaim at ¶ 27.  I cannot say that as a

14   matter of law, the counterdefendants' actions were not extreme

15   and outrageous, and her declarations establish the seriousness

16   of the injuries and the viability of the claim.[7]

17        Although not at all times a model of clarity, the

18   _____

19        [5]  Counterclaimants also include a claim for contract
     rescission.  See Amended Counterclaim ¶ 5.  However, Dr.
20   Hilsenrath was not the only party to the settlement, and it is
     unclear how rescission would impact the other signatories.  For
21   this reason, I do not recommend rescinding the settlement
     agreement.  Counterclaimants abandoned their fourth cause of
22   action.  See Docket No. 286 (Hilsenrath Decl. Re: Damages).

23        [6]  "The elements of the tort are '(1) extreme and
     outrageous conduct by the defendant with the intention of
24   causing, or reckless disregard of the probability of causing,
     emotional distress; (2) the plaintiff's suffering severe or
25   extreme emotional distress; and (3) actual and proximate
     causation of the emotional distress by the defendant's
26   outrageous conduct.'"  Ess v. Eskaton Properties, Inc., 97 Cal.
     App. 4th 120, 129 (2002)(quoting Cervantez v. J.C. Penney Co.,
27   24 Cal.3d 579, 593 (1979)).

28        [7]  As pleaded, the fifth cause of action applies only to
     Mrs. Hilsenrath's emotional distress.

1   pleading is neither garbled nor incomprehensible.  Liberally
2   construed, it sufficiently states causes of action for
3   invasion of the constitutional right to privacy and
4   intentional infliction of emotional distress.

5       Counterclaimants have the burden of proving damages.
6   Damages granted, however, will not be different in kind or
7   exceed the amount prayed for in the complaint.  See Philip
8   Morris USA, Inc. v. Castworld Prods., Inc., 219 F.R.D. 494,
9   498 (C.D. Cal. 2003) (citing Fed. R. Civ. P. 54©, 55(b)(2)).
10  Proximate cause, if pled, is admitted, and all the plaintiff
11  need show is that the compensation prayed for relates to the
12  damages flowing from the injuries pled.  Id. (citing Greyhound
13  Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 159
14  (2d Cir. 1992) and Wu v. Ip, 1996 WL 428342, at *1 (N.D. Cal.
15  1996)).

16      In their complaint, counterclaimants sought $26.5 million
17  in compensatory damages; punitive damages, attorneys fees, and
18  other costs according to proof; and interest.[8]  Amended
19  Counterclaim at 10.  In light of their declarations,
20  counterclaimants have proven up the following damages: $3
21  million in cash paid by Dr. Hilsenrath to counterdefendants in
22  settlement of the initial lawsuit; 750,000 options of USWC
23  stock valued at $2,182,500 granted to counterdefendants in

24

25  ─────────────
26       [8]    In their declarations and filings before the Court,
    counterclaimants have requested varying amounts of damages in
    addition to the $26.5 million in compensatory damages.  I view
27  the $26.5 million figure as a cap on compensatory damages due
    to the fact that it was the only figure prayed for in the
28  complaint.

5

1    settlement of the initial lawsuit;[9] general damages to Dr.

2    Hilsenrath in the amount of $2.5 million;[10] and emotional

3    distress damages to Mrs. Hilsenrath in the amount of $2.5

4    million.[11]  I recommend denying counterclaimants' requests for

5    $15,423,000 lost as a result of USWC's bankruptcy;[12] punitive

6

7    _____

8         [9]  Valuation of the stock options is based on the value
     of the stock ($2.91) on its last day of trading, May 29, 2001.
9    See Appl. for Entry of Def. J., Exh. 6 (Decl. of Dr.
     Hilsenrath), and Exh. (I) thereto; cf. Docket No. 286
10   (Hilsenrath Decl. Re Damages (claiming, without justification,
     a valuation at $2.94 per share)).

11        [10]  A breach of the constitutional right to privacy
     appears to support a claim for general damages, including those
12   relating to "anxiety, embarrassment, humiliation, shame,
     depression, feelings of powerlessness, anguish, etc."
13   Operating Engineers Local 3 v. Johnson, 110 Cal. App. 4th 180,
     187 (2003) (internal quotations and citations omitted).  In his
14   various declarations, Dr. Hilsenrath claims to have unjustly
     suffered due to counterdefendants' actions, and the facts as
15   otherwise pleaded make clear that the doctor attributes the
     loss of his job and a large portion of his wealth to the
16   tortious acts.

17        [11]  In her first declaration, Mrs. Hilsenrath asks that
     the family's "financial loss" of $37.5 million be awarded and
18   doubled.  In their later declarations, both ask for additional,
     varying damages to compensate for emotional distress.  However,
19   only Mrs. Hilsenrath pled a claim for intentional infliction of
     emotional distress.  Nor in this circumstance, in which no
20   physical injury befell counterclaimants, do such large amounts
     seem proper.

21
          [12]  Counterclaimants claim to have lost 5.3 million
22   shares of USWC stock as a result of its bankruptcy.  See Docket
     No. 286.  Counterclaimants, however, fail to plead or otherwise
23   provide evidence of a causal connection between
     counterdefendants' torts and USWC's bankruptcy.  In the
24   counterclaim, for example, they state only that "USWC did not
     survive the dismissal of its founder and CEO, and went bankrupt
25   6 weeks later."  Amended Counterclaim ¶ 6.  Dr. Hilsenrath
     makes a similar statement in his declaration in support of the
26   application.  See Appl. for Entry of Def. J., Exh. 6 (Decl. of
     Dr. Hilsenrath at 2:16-17).  That USWC collapsed so soon after
27   Dr. Hilsenrath's termination does not prove it collapsed
     because of the tortious conduct.  In fact, it suggests USWC may
28   have had other problems.

1  damages;[13] attorneys fees;[14] and a number of other claimed

2  losses.[15]  In total, counterclaimants have proven $10,182,502

3  in damages.

4

5  _____

6  [13]  Punitive damages may be awarded as part of a default
   judgment award, see, e.g., Bennett v. American Medical
   Response, Inc., 2007 WL 900989 (9th Cir. 2007), and are

7  available "[i]n an action for the breach of an obligation not
   arising from contract" upon a finding of "oppression, fraud, or

8  malice."  Cal. Civ. Code § 3294(a).  Although counterclaimants
   state in their complaint that several of the persons who

9  engaged in the tortious conduct were "managers and directors"
   of the defendants, there is no evidence of each manager's

10 relation to a particular counterdefendant; of which manager's
   conduct resulted in which injury; or to what degree each

11 defendant may be liable for the injuries caused.  See, e.g.,
   Judicial Council Of California Civil Jury Instruction 3943

12 (requiring claimant to demonstrate particular connections
   between an employee and employer).  Nor have counterclaimants

13 submitted clear and convincing evidence of the degree of
   oppressiveness or reprehensibility of counterdefedants' conduct

14 as required by California punitive damages law, or evidence of
   their wealth.  See Simon v. San Paolo U.S. Holding Co., Inc.,

15 35 Cal.4th 1159, 1185 ("[T]he defendant's financial condition
   is an essential factor in fixing an amount that is sufficient

16 to serve these goals without exceeding the necessary level of
   punishment.").  To the contrary, they have alleged that the

17 counterdefendants are defunct shell companies.  For all these
   reasons, they have not met their evidentiary burden of proving

18 punitive damages.

19 [14]  Counterclaimants give no legal authority for their
   claim for $4.7 million in attorneys fees.  Moreover, the claim,

20 Docket No. 286, is unsupported by records or details and is
   therefore insufficiently proven up.

21

22 [15]  Counterclaimants averred at the hearing and in
   subsequent filings that they owned 24% of USWC, and that they
   should be entitled to 24% of the monies and stocks paid by USWC

23 to counterdefendants to settle the initial lawsuit.
   Counterclaimants, however, provided no authority for this

24 proposition and, moreover, provided no evidence of whether or
   how USWC's assets were distributed in bankruptcy.  Thus, it is

25 not clear that counterclaimants should be, or could be,
   compensated in the manner they request.  Their claim for a

26 $3.18 million severance package, see Docket No. 286, is
   speculative and conclusory, supported by little evidence, and

27 is therefore insufficient.  Their claim for $7.3 million in
   funds frozen by the U.S. government, id., cannot be said to

28 flow logically from counterdefendants' actions and, therefore,
   should be denied.

7

1    Rule 1 of the Federal Rules of Civil Procedure requires

2    that the rules "be construed and administered to secure the

3    just, speedy, and inexpensive determination of every action."

4    The need to end this five year old suit, coupled with the

5    failure of counterdefendants to appear before Judge Wilken or

6    to otherwise defend against the amended counterclaim, are

7    factors that strongly weigh in favor of granting

8    counterclaimants' application.[16]

9    For the reasons articulated herein, I recommend **GRANTING**

10   counterclaimants request for entry of default judgment in the

11   amount of $10,182,502.[17]   I also recommend an award of

12   prejudgment interest on $5,182,502 pursuant to Civil Code

13   §3287(a).

14   Dated: May 18, 2007

15   _____

16   Bernard Zimmerman
     United States Magistrate Judge

17

18   G:\BZALL\-REFS\HILSENRATH\DEF.JUDG.ORDERbz.wpd

19   _____

20   [16]   At the hearing, counterclaimants moved to substitute
     Equity Trust as a counterdefendant, claiming that the
     counterdefendants are now defunct.  In fact, Judge Wilken

21   already denied leave to file an amended complaint adding
     Equity.  See Docket No. 269.  Moreover, the motion to

22   substitute was neither noticed, properly briefed nor served.
     For these reasons, I recommend that the motion be denied.

23

24   [17]   I recommend denying counterclaimants' request that a
     constructive trust be placed on all funds relating to
     settlement of the lawsuit.  See Amended Counterclaim at ¶¶ 18,

25   19; Docket No. 286 (Hilsenrath Decl. Re Damages).  A
     constructive trust is an equitable remedy imposed to prevent

26   unjust enrichment.  See Murphy v. T. Rowe Price Prime Reserve
     Fund, Inc., 8 F.3d 1420, 1422-23 (9th Cir. 1993) (citing

27   California case law).  Because the counterdefendants are
     dissolved and there is no showing where the funds now are, it

28   is unclear how a constructive trust would prevent a gain at
     counterclaimants' expense.  See Docket No. 286.

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JANVRIN HOLDINGS LIMITED, CROSSGAR          No. C 02-01068 CW
LIMITED, and RYBURN LIMITED,

     Plaintiffs,

  v.

                                     DEFAULT JUDGMENT

DR. OLIVER HILSENRATH,

     Defendant.

_____

DR. OLIVER HILSENRATH and HANA
HILSENRATH,

     Counterclaimants,

  v.

JANVRIN HOLDINGS LIMITED, CROSSGAR
LIMITED,  and RYBURN LIMITED,

     Counterdefendants.
_____/

     For the reasons set forth in this Court's Order Adopting in

Part and Modifying in Part Magistrate Judge's Report and

Recommendation Re: Countercalimants' Motion for Entry of Default

Judgment,

     IT IS ORDERED AND ADJUDGED

     That Counterclaimants Dr. Oliver Hilsenrath and Hana

Hilsenrath recover of Plaintiffs Janvrin Holdings Limited, Crossgar

Limited, and Ryburn Limited the total sum of $5,282,500.00 (which

United States District Court
For the Northern District of California

Case 4:02-cv-01068-CW    Document 304    Filed 07/26/2007    Page 2 of 2

**United States District Court**
**For the Northern District of California**

1  includes $50,000 in general damages for Dr. Oliver Hilsenrath and

2  $50,000 in damages for emotional distress for Hana Hilsenrath).

3  Prejudgment interest on the $5,182,500.00 in damages related to the

4  settlement of the underlying lawsuit is awarded at a rate of seven

5  percent per annum from the date the settlement was paid through the

6  date of entry of judgment and postjudgment interest on the sum of

7  $5,282,500.00 as provided by 28 U.S.C. § 1961.

8       Dated at Oakland, California, this 26th day of July, 2007.

9                                    RICHARD W. WIEKING
                                     Clerk of Court
10

11                                   *Sheilah Cahill*

12       By:  _____
                                     SHEILAH CAHILL
13                                   Deputy Clerk

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# ATTACHMENT E

**FEDERAL PUBLIC DEFENDER**
NORTHERN DISTRICT OF CALIFORNIA
19TH FLOOR FEDERAL BUILDING - BOX 36106
450 GOLDEN GATE AVENUE
SAN FRANCISCO, CA 94102

**BARRY J. PORTMAN**
*Federal Public Defender*
**STEVEN G. KALAR**
*Assistant Federal Public Defender*

Telephone: (415) 436-7700
Fax:        (415) 436-7706

Thursday, February 9, 2006

Mr. Grant Brown - Director (by Facsimile and registered mail)
Equity Trust (Jersey) Limited
Equity Trust House
PO Box 546
28-30 The Parade
St Helier
Jersey JE4 8XY
Channel Islands

**RE:** *The Hilsenrath Family Trust (The Firefly Trust)*

Dear Mr. Brown,

I am the Senior Litigator in the Office of the Federal Public Defender, Northern District of California. I have been appointed to represent Mr. Oliver Hilsenrath in a federal criminal action now before the Honorable William H. Alsup. As you may know, in the United States public defenders are appointed to represent defendants in criminal cases when a court determines that the defendant is indigent. In large part because of the actions of Equity Trust, my client has been determined to be indigent – a determination which has resulted in my appointment.

Mr. Hilsenrath does not want to be represented by a public defender. Instead, he wishes to retain private counsel to represent him in this criminal proceeding. I am informed that he has requested that funds be released from the Hilsenrath Family Trust (Firefly Trust) to permit him to retain private counsel. I am also informed that the Equity Trust has not done so.

I have spoken at length to the Assistant United States Attorney who is prosecuting the federal criminal case mentioned above. She informs me that there is no freeze by the Jersey government of the funds sought.

In light of my client's previous requests for release of funds, and in light of my formal request in this letter, please immediately release the funds previously identified to Mr. Hilsenrath.

If Equity Trust declines to release these funds, please respond to me in writing its bases for the continued retention of these assets. I am hard-pressed to imagine a more compelling need

Letter of AFPD Kalar
February 9, 2006
Pg. 2


for funds than for the effective defense of a federal criminal case. It is unclear why Equity Trust has not released the funds thus far.

      Should Equity Trust decline to release the funds, please note that I will be pursuing all available legal remedies on behalf of my client. Specifically, I anticipate litigation on the Trust's seizure of these funds before the Honorable William Alsup. If the funds will not be released, please also provide the name and contact information for your counsel in the United States who will represent the Trust in this anticipated litigation.

      Thank you for your prompt attention to this matter. I look forward to prompt release of the funds, or to your explanation for the continued seizure.

                  Sincerely,

                  BARRY J. PORTMAN
                  Federal Public Defender
                  Northern District of California


                  STEVEN G. KALAR
                  Assistant Federal Public Defender
                  Northern District of California